MANHATTAN FUEL COMPANY, INC., Plaintiff,

v.

NEW ENGLAND PETROLEUM CORPORATION, Defendant.

No. 71 Civ. 793.

United States District Court, S. D. New York.

Sept. 13, 1977.

As Amended Sept. 16, 1977.

Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiff; by A. Edward Grashof, Arnold S. Anderson, Marie L. McCann, New York City, of counsel.

Eaton, VanWinkle & Greenspoon, New York City, for defendant; by Samuel N. Greenspoon, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

This opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P., following a fourteen day trial of this diversity action to recover brokerage commissions.

The controversy centers around an agreement between defendant New England Petroleum Corporation ("NEPCO"), a New York corporation engaged in the business of importing, refining and selling oil, and John S. Routh, Jr. ("Routh"), the president and sole stockholder of both plaintiff, a Connecticut corporation, and plaintiff's assignee Manhattan Coal Company, another Connecticut corporation, to which Routh had assigned all of his rights in a coal brokerage and agency business in December 1967. In my opinion and order of September 13, 1976, denying defendant's motion to dismiss the complaint on the grounds, *inter alia*, of the Statute of Frauds, I found the existence of this agreement to be evidenced by a series of letters between Routh and Richard Weinand, defendant's Executive Vice-President. This correspondence indicated that defendant agreed to engage Routh as a broker to obtain the business of Niagara Mohawk Power Corporation ("Niagara Mohawk") as a fuel oil customer for defendant and to pay Routh a commission of five cents per barrel of oil delivered to Niagara Mohawk for the term of the contract so obtained. 422 F.Supp. 797, 800–01. It is undisputed that on July 17, 1970, defendant entered into two long-term fuel oil supply contracts with Niagara Mohawk, covering that utility's Albany and Oswego, New York, electric power generating stations, and that from August 1970 through October 31, 1976, defendant delivered a total of 41,279,439 barrels of oil, of which 23,672,790 went to Albany and 17,606,649 were delivered to the Oswego station. However, defendant has refused to pay plaintiff any commissions owed under the agreement with Routh.

Defendant contests plaintiff's entitlement to these commissions, claiming that any agreement between the parties required Routh to obtain, on defendant's behalf, the right to engineer, construct, finance, own and operate Niagara Mohawk's Albany oil storage facilities in addition to a long-term fuel oil supply arrangement (the "package deal"); that, in any event, any agreement between the parties related solely to the Albany station; and that, alternatively, the Niagara Mohawk contracts did not result from Routh's efforts. In addition, defendant has renewed its objection to this action on the grounds of the Statute of Frauds, and seeks a reconsideration of my ruling that plaintiff is not disqualified from

suing here by reason of Section 1312 of the New York Business Corporation Law. *See* 422 F.Supp. at 801-02.[1]

The pertinent facts and circumstances surrounding the dispute, as adduced at trial, are as set out below.

## I.

In March 1967, Routh happened to meet Edward M. Carey ("Carey"), defendant's president, at the bar of the 21 Club in Manhattan. Routh had just resigned his position as president of the Pittston Company, which was involved in coal and fuel oil distribution and of whose subsidiary, Metropolitan Petroleum Corporation, Routh had been in charge. Carey was aware of this, and Routh told him that he had started his own coal brokerage business. On Routh's suggestion that the two men might have a "community of interest," Carey invited Routh to get in touch with him.

On May 25, 1967, the two men met in Carey's office and discussed Routh's connections with various utilities and the geographical areas into which Carey was desirous of expanding his oil business, particularly sales to utilities. They spoke of Routh's selling oil to various of these utilities and some industrial companies on defendant's behalf; Niagara Mohawk was included with particularity because it was rumored that this company was considering a conversion at its Albany station from coal to oil.

Although Routh testified that Carey agreed simply to pay him five cents per barrel for each barrel of oil sold for defendant—that sum expressly discussed as being the equivalent to Routh's usual twenty-to-twenty-five cents per ton of bituminous coal commission—and that neither the oil specifications nor the offering price of the oil to be sold was discussed, Carey's testimony indicated a different arrangement. According to Carey, Routh was told that defendant desired an arrangement at Niagara Mohawk's Albany station similar to that which defendant had with Con Edison. Carey described that as consisting of defendant's putting up storage at the North First Street Terminal in Brooklyn, building a pipeline through New York City to connect with Con Edison's Ravenswood plant and supplying inventory into that day tank. According to Carey, this package deal [2] was typical of defendant's arrangements at that time with two other utilities. Carey also stated that he had quoted Routh an offering price for the Niagara Mohawk Albany Station of $1.85 per barrel, which he referred to as the "posted price" for No. 6 fuel oil delivered to that location, and that Routh told him that Niagara Mohawk would consume about 4,000,000 barrels a year. Carey denied reaching any agreement with respect to the commission to be paid for the solicitation of utilities other than Niagara Mohawk, and, although he claimed that five cents per barrel was five times the normal rate of commission at that time, he disclaimed the existence of any discussion of how the parties arrived at this figure for Niagara Mohawk.

Despite Carey's testimony that the $1.85 price was discussed at the May 25 meeting, one week thereafter Routh wrote to Carey for confirmation of the oil specifications and for an indication of the delivered oil price to Albany. This letter is silent with regard to any proposed costs for storage facilities.

On June 8, 1967, Routh met with David Winkworth ("Winkworth") and Leland McCormack ("McCormack"), who were in

1. In ruling on plaintiff's motion to amend its complaint, I determined that plaintiff was entitled to plead a right to recovery on both an express contract and *quantum meruit* theory. 422 F.Supp. at 802. At the close of plaintiff's case, defendant unsuccessfully sought to require plaintiff to elect between theories. Defendant then moved at the conclusion of the trial to dismiss one of these claims. It is clear that both of plaintiff's theories of recovery may properly be submitted to the trier of fact, *see Geller v. New England Industries*, 535 F.2d 1381 (2d Cir. 1976). I have determined plaintiff's rights under the express contract between the parties, thereby rendering unnecessary any consideration of the *quantum meruit* claim.

2. It is conceded that the term "package deal" or any equivalent thereof, was never used.

charge of purchasing fuel for Niagara Mohawk, in their offices in. Syracuse, New York. Routh described NEPCO's business and sought confirmation of the conversion rumor. He was told that the purchasing department was in favor of conversion to oil but that the higher level Niagara Mohawk management was not yet convinced. The focus of the discussion was on the Albany station because of its location, but the Oswego station, among others, was also mentioned. To persuade management, and for use in connection with a feasibility study of the proposed Albany conversation, Routh was asked to prepare and submit a written oil supply proposal, which would be considered by Niagara Mohawk along with other oil price quotes that had been obtained.

Carey was telephonically advised of the results of this meeting, and on June 13, 1967, Routh met with him to obtain the specific information to be included in this proposal. At that time, Carey introduced Routh to Weinand, who was to be Routh's contact at NEPCO. Pursuant to information gleaned from Carey and Weinand, Routh wrote a letter to Winkworth later that day offering 4,300,000 barrels of No. 6 oil for the Glenmont, (i. e., Albany) station, at a price of $1.82 per barrel delivered by tanker alongside Niagara Mohawk's dock and pumped into Niagara Mohawk's storage. Other provisions were specified which are not significant, but no mention was made of defendant's construction or ownership of the facilities. Notwithstanding this, both Carey and Weinand approved the letter either before or after it was sent, and conceded that the $1.82 price quoted included Routh's five-cent-per-barrel commission.

Despite any express approval of this letter by defendant, Carey testified that he was not happy with Routh's letter of June 13, 1967, and that he complained to Weinand about Routh's failure to include a package deal therein. A second letter, dated July 5, 1967, was prepared by Routh and Weinand and sent to Winkworth under Routh's signature. This letter referred to the earlier one and outlined NEPCO's willingness "to guarantee on a firm 5 or 10-

year basis" that NEPCO would finance the entire cost of conversion from coal to oil, including the erection of oil storage and dock facilities, and if Niagara Mohawk so desired, NEPCO would construct these facilities under Niagara Mohawk's engineering supervision. The cost of conversion, as approximated by Winkworth, was to be $500,000. "On this basis," the letter continued, "the cost plus interest would be included in the price of the fuel oil delivered alongside the dock. Amortization would be over the life of the supply contract . . ." Winkworth was additionally told that his company could "acquire the facilities at the end of the contract period, or after 3 years on the basis of the depreciated value of the facilities;" and that, in addition, NEPCO "[was] prepared to carry the cost of inventory and invoice [Niagara Mohawk] on the basis of product delivered from storage into [the] day tank."

According to Routh, however, it was not any omission which prompted this letter of July 5, 1967, but rather Carey's and Weinand's apprising Routh, at a meeting held between these men immediately prior to the writing of this letter, of the concept of a package deal for the very first time. Although Weinand initially testified that he complained to Routh about his June 13 letter, he later conceded that, indeed, Routh was ignorant of this package concept until the same was explained to him on July 5, 1967.

This explanation was triggered, Routh was told, by the acceptance of such a deal by another of defendant's utility customers. Routh testified that Carey and Weinand outlined this deal to him on July 5, 1967, in substantially the same manner as was detailed to Winkworth, and that Routh was told that such an arrangement was advantageous to those utilities with a "fuel adjustment clause" in their rate schedules because they would thereby be enabled to convert what would otherwise be a capital expenditure into an ordinary fuel expense which could be passed on to the customers. Routh claimed that he was authorized to offer this arrangement to Niagara Mohawk

to thus make NEPCO's offer more competitive, but that at no time was he told that the payment of his commissions was contingent on his obtaining this arrangement.

In fact, shortly after the receipt of the July 5, 1967 letter, Winkworth advised Routh that Niagara Mohawk was not interested in having NEPCO own or operate the Albany facilities, should Albany be converted, and that Niagara Mohawk did not have a fuel adjustment clause in its rate schedule. This rejection of the package deal was transmitted to defendant.

Negotiations with Niagara Mohawk, however, proceeded apace. In early July 1967, Routh recruited Willis H. Stephens ("Stephens"), a coal broker with long-time personal and business ties with the senior management of Niagara Mohawk, to act as his co-broker in the solicitation of Niagara Mohawk's oil business on defendant's behalf. This arrangement was disclosed to and accepted by defendant, and thereafter Stephens participated in the numerous meetings which followed between Routh and Niagara Mohawk personnel.

On July 27, 1967, pursuant to Routh's request for a letter confirming Routh's relationship with defendant, Weinand wrote the following to Routh:

"This has reference to your letter dated July 5, 1967 addressed to Mr. David A. Winkworth . . . regarding our interest in financing and constructing the necessary facilities to handle their residual fuel oil requirements on a long-term basis.

"This is to advise you that if you are successful in securing the business referred to in the foregoing letter we are prepared to pay you a 5¢-per-barrel commission for the term of the contract."

In response, Routh wrote to Weinand on July 31, 1967:

"Thanks for your letter of July 27th confirming our arrangements regarding the sale of fuel oil supplied by New England Petroleum Corporation to Niagara Mohawk Power Corporation. These arrangements are to the effect that Manhattan Coal Company will receive a commission of 5¢ per barrel from New England Petroleum Corporation for any oil delivered under a contract successfully negotiated on your behalf by Manhattan Coal Company."

In addition, Routh suggested that he invoice Niagara Mohawk directly on a monthly basis for oil delivered, and remit to defendant the invoice price less the commission. On August 1, 1967, after consulting with Carey, Weinand informed Routh that such a billing procedure was unsatisfactory; however, Routh was desirous of some written protection in the event of a renewal or renegotiation of a Niagara Mohawk contract. Consequently, on August 3, 1967, Weinand wrote to Routh rejecting Routh's proposed invoicing procedure and confirming that Routh's five cents per barrel commission would prevail for the life of any NEPCO–Niagara Mohawk oil supply arrangement with the commissions payable on any renegotiation to be agreed upon.

In the fall of 1968, after hundreds of telephone calls and close to two dozen meetings variously between Routh and NEPCO and Niagara Mohawk personnel, Niagara Mohawk, on the basis of a feasibility study conducted with respect to the Albany station, decided to convert that station from coal to oil. On September 11, 1968, Niagara Mohawk issued requests for bids for the supply of No. 6 fuel oil for its Albany station. In response thereto, Weinand and Routh prepared two letters, each dated October 1, 1968. One letter offered to supply oil at $1.69 per barrel, delivered to Niagara Mohawk's storage facility alongside its dock. This was accompanied by a cover letter which referred to the July 5, 1967 letter from Routh and repeated NEPCO's willingness to enter into a package deal. Both letters were hand-delivered to Niagara Mohawk by Stephens.

Again, according to Routh, the contents of the cover letter were included to make NEPCO's offer more competitive; Weinand claimed that this letter was necessary since the offer letter itself had to specifically conform to the request for bids. Notwithstanding this motivation, Carey and Wei-

964

nand both conceded that the $1.69 price quoted included Routh's five cents per barrel commission.

On December 6, 1968, Routh met with Carey and Weinand to discuss his brokerage arrangement with respect to solicitations of utilities other than Niagara Mohawk. At this time he agreed to a reduction of his commission to 2½¢ per barrel. This reduction was confirmed by letter agreement dated December 6, 1968 between the parties which set out their arrangement on all utilities to be solicited by Routh. Thus, the agreement stated that plaintiff "would have the privilege of offering [defendant's] fuel oil exclusively to the following accounts," which listed Niagara Mohawk among them, and continued that "[i]n reference to Niagara Mohawk Power Company, [plaintiff's] commission will be maintained at 5¢ per barrel . . . ." Weinand executed this letter agreement, returning it to Routh on December 26, 1968 with a cover letter indicating a minor change and characterizing the agreement as "our mutual understanding relating to your soliciting residual fuel oil outlets for the New England Petroleum Corporation."

By January 1969, Routh was engaged in setting up meetings between Niagara Mohawk and NEPCO engineers to discuss the construction of the proposed Albany oil handling and dock facilities. At these meetings, NEPCO was represented not only by Weinand, but by Robert G. Connolly ("Connolly"), as well, who had moved from defendant's Massachusetts office to "head sales" at the New York office, and to whom Routh reported with respect to the solicitation of other utilities, and, since the fall of 1968, Niagara Mohawk. At one of these meetings on January 17, 1969, Lawrence Butler, defendant's chief engineer,[3] was asked to prepare an estimate of the construction costs. In order to do so, he explained to the assemblage, which included Routh, Connolly, Weinand, Winkworth and

others, that if defendant owned the facilities, Niagara Mohawk would need a day tank in which to store and by which to measure the quantity of oil which it would be billed for burning; but that if Niagara Mohawk owned the facilities, no day tank would be needed. Butler's notes of the meeting indicate that the estimate was not to include a cost figure for a day tank.

Sometime after November 1968, but prior to May 1969, Routh was advised by Winkworth that Niagara Mohawk had decided to build two new generating units to be tentatively located at Albany. The possibility, however, that the units would be sited at other locations, such as Oswego or Waddington, had also been discussed, and NEPCO was aware of these developments. A meeting to secure the Albany business was arranged, and on May 19, 1969, Routh, Stephens, Weinand, Connolly, Winkworth, McCormack and Marvin Paxton ("Paxton"), Niagara Mohawk's vice-president in charge of fuel purchasing, met in Syracuse. At this meeting, Weinand agreed to reduce defendant's offering price to $1.67 per barrel and Niagara Mohawk agreed to award defendant a ten-year contract. A letter confirming the agreement was requested of defendant. Weinand testified that this $1.67 price included Routh's five-cents per barrel commission.

The testimony regarding what followed the agreement at this meeting is in dispute. According to Routh and Stephens, when the agreement was made, Weinand and Paxton shook hands, and comments were made by the group indicating that the next step was Oswego. As Routh put it and Stephens agreed the group chorused "On to Oswego." Weinand, however, denied any such reference to Oswego at this meeting.

The day following the meeting, Connolly prepared a written proposal which he sent to Paxton, with copies to Routh, Stephens and Winkworth, confirming the arrange-

**3.** Butler testified that in order to proceed with the Albany construction, NEPCO would have had to engage consulting engineers since he was NEPCO's only engineer, and had been with defendant since 1965. Weinand agreed; but

Carey claimed that NEPCO employed eight engineers—"a whole engineering staff"—in 1967; and indicated that in 1972, there were at least two.

ment with Niagara Mohawk and reiterating that defendant "[was] prepared to design, engineer, construct, finance, and operate if desirable, the oil handling facilities at" Albany. By letter dated May 28, 1969, Paxton accepted the proposal only "for furnishing our requirements of No. 6 Fuel Oil for our Albany Steam Station" and indicated that a formal agreement was being prepared and would be forwarded for defendant's signature.

A draft of this agreement was forwarded to Connolly in December 1969. The draft only covered the supply of oil; no package deal provisions were included. On January 9, 1970, Connolly returned a revised draft to Niagara Mohawk; the revision likewise contained no reference to a package deal. Weinand testified that it was not until the draft was received that he knew that Niagara Mohawk had rejected the package deal proposal; Carey claimed to be ignorant of this fact until Connolly told him in June 1970.

In the meanwhile, in August 1969, at a luncheon attended by Routh, Winkworth and Connolly, Winkworth asked Connolly to supply a price quotation to be used in connection with a feasibility study of the Oswego conversion, and by letter dated August 27, 1969, Connolly quoted a price of less than $2.15 per barrel of oil delivered into shore tankage at Oswego. This quote was orally revised by December 1, 1969, after Routh had suggested supplying Oswego by pipeline from Albany. Meetings were held in November 1969 and February 1970, to discuss siting of the proposed new generating units and methods of oil delivery to Oswego or to another location on the St. Lawrence seaway. Routh, along with NEPCO and Niagara Mohawk personnel, was in attendance.

On April 21, 1970, Carey wrote to Paxton offering to supply oil to Niagara Mohawk at Oswego at a price between $2.10 and $2.15 per barrel. Following this letter, however, change overcame the world oil market, tightening the supply of oil and dramatically increasing prices. Connolly and Paxton met, on Winkworth's suggestion as transmitted by Routh, and an increase in the Albany oil price was negotiated. Meanwhile, Connolly had begun to draft an oil supply contract for Oswego similar to that redrafted by him for Albany. The Albany contract, executed by Niagara Mohawk, was forwarded to defendant by Paxton on May 11, 1970.

On May 25, 1970, Connolly, in a memorandum to Carey, suggested the use of a new price escalation formula in the Albany and Oswego contracts in light of the fluctuating oil market, and he was authorized to discuss the proposal with Niagara Mohawk. June 1970 brought a series of meetings during which final prices and the escalation formula were discussed. Final drafts of the Albany and Oswego contracts were prepared, and were executed on June 17, 1970. Routh and Stephens did not participate in these meetings; the reason therefor is disputed. According to Weinand, their exclusion was at Paxton's request; Winkworth claims it was Connolly who, because of the unique nature of the escalation provisions, requested that they not attend. Connolly's testimony taken at his deposition indicates that their exclusion was by mutual agreement with Paxton, acting on Connolly's suggestion.[4] From Carey's point of view, however, these June meetings were the simple and direct result of Carey's informing James O'Neil ("O'Neil"), Niagara Mohawk's president, following Carey's being apprised by Connolly in June 1970 that Niagara Mohawk would not go along with the package deal in Albany, that NEPCO and Niagara Mohawk had no contract and the deal was off. According to Carey, Routh had not procured the June 17, 1970 contracts; and the final contract price did not include Routh's commission.

Despite this testimony, however, beginning in July 1970, Weinand began to attempt to convince Routh to accept reduced

4. Connolly did not appear to testify at trial. He was working for defendant outside of Albany but was also (perhaps conveniently) outside the 100 mile limit referred to in Rule 32(a)(3) F.R. Civ.P.

commissions. In late August 1970, Weinand met with Routh and told him that as a result of a price concession made to Niagara Mohawk, NEPCO would only pay as a commission two cents per barrel for Albany and one cent for Oswego. This offer was repeated to Routh in December 1970, and rejected. Carey was informed of this by memoranda dated September 2 and December, 1970. Finally, on January, 8, 1971, Weinand repeated this reduced offer to Stephens in the presence of an employee of Stephens' company. Weinand stated at that time that Routh's commissions should be cut because Stephens did all the work and that Weinand had agreed to the five cent figure originally only at Carey's direction. Contrary to Carey's testimony that the final contract prices did not include the five cent figure, Weinand conceded to Stephens that the original figure was included in every price adjustment. And, according to Carey, it was Weinand and Connolly who set the price in the final contracts. Stephens told Weinand to speak directly with Routh.

This litigation commenced the following month. On April 13, 1971 Weinand wrote to Routh, referring to Routh's letter of June 26, 1971 which amended the December 6, 1968 agreement to include another utility situation and reconfirmed that agreement in all other respects, that all rights and authority theretofore granted Routh to act on defendant's behalf were "withdrawn, terminated, and cancelled."

## II.

In light of this lengthy factual background, I turn to a consideration of the disputed issues. At the outset, defendant's renewed objections to this action based on the Statute of Frauds and Section 1312 of the New York Business Corporation Law can be readily disposed of. Both contentions were considered and rejected in my opinion and order of September 13, 1976, in which I ruled that the exchange of letters between Routh and Weinand dated July 27, 1967, July 31, 1967, August 3, 1967, December 6, 1968 and December 26, 1968, evidenced the agreement between the parties sufficient to satisfy the Statute of Frauds, with the ambiguity in one of the terms to be resolved by parol evidence at trial; and that Section 1312 would not operate to bar this suit. 422 F.Supp. 797. Based on defendant's representation that evidence to be adduced at trial would merit reconsideration of these contentions, I allowed defendant to renew them. However, defendant has utterly failed to convince me that any new fact has been unearthed which would materially alter my decision. My initial ruling, therefore, stands.[5]

■ Turning to the merits of this case, the initial question is whether the agreement between the parties required Routh, in order to earn commissions, to obtain a package deal from Niagara Mohawk on defendant's behalf, or whether the package concept was to be offered merely to induce Niagara Mohawk to simply enter into a long-term fuel oil supply agreement with defendant. The evidence demonstrates that the latter was the case.

Routh's version of his May 25, 1967 meeting with Carey out of which the oral agreement between the parties was undisputedly born, is wholly credible. He testified that neither a package deal, offering price of oil,

5. Defendant's contention that Section 1312 bars this action was recently rejected by the Second Circuit in In re Grand Bahama Petroleum Co., Ltd. v. Asiatic Petroleum Corp., 550 F.2d 1320, 1324 (2d Cir. 1977), a case in which [de]fendant's counsel personally and successfully proffered the same argument as plaintiff here. In that case the Court of Appeals recognized, as I did in my September opinion, that Section 1312 is not jurisdictional, but merely requires an unauthorized foreign corporate plaintiff doing business in New York to seek authority and pay the requisite fees and taxes therefor before proceeding with the suit.

Moreover, although I did not deem it necessary to reach the issue previously, see 422 F.Supp. 797, 801, n.4, I am not unmindful of the Supreme Court's ruling in Allenberg Cotton Co. v. Pittman, 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974), that a state "door closing" statute, such as that invoked here, may not preclude a federal diversity action which concerns interstate commerce; the interstate aspects of the fuel oil business are manifest.

nor oil specifications were discussed; and his letter of June 1, 1967 to Carey, dealing generally with low-grade sulphur fuel oil for New Jersey utilities but requesting specifications for higher grade materials, as well as the delivered prices to Albany, indicates that he was unaware of the same when he left the meeting. His June 13, 1967 letter to Winkworth, setting forth the oil supply proposal, quotes a quantity of 4,300,000 barrels at certain specifications at a price, not of $1.85 which Carey claimed was to be the offering price discussed on May 25, 1967, but of $1.82. Weinand testified that he supplied Routh with the $1.82 price, as approved by Carey, on June 13, 1967, for use in Routh's proposal of the same date. Although Carey denied discussing the $1.82 price with Weinand, he conceded that he could have originally quoted that price to Routh. Routh, however, testified that Carey indeed did quote the $1.82 price, but not until June 13, 1967, during the meeting with him and Weinand.

The fact that no package deal was discussed prior to this letter is substantiated by the absence from the letter proposal of any mention of the same; this letter was concededly approved by Carey. Indeed, Weinand testified that the package concept was not explained to Routh until July 5, 1967, and the fact that this package proposal was not offered to Niagara Mohawk until that time bears this out.

Moreover, the Con Edison arrangement with defendant, as evidenced by the contracts between them, does not provide that defendant was to own the North First Street Storage and that defendant's inventory was to be supplied into the Ravenswood day tank, which Routh was allegedly

told by Carey on May 25, 1967, but rather indicates that Con Edison owns that storage and carries its own inventory.[6]

It is clear that the July 5, 1967 letter offers a package deal to Niagara Mohawk; it is equally clear that Weinand's letter to Routh of July 27, 1967 confirming Routh's commission makes reference to that offer. However, none of the other letters evidencing the brokerage arrangement between the parties does so; and the December 8, 1968 agreement between Routh and Weinand setting forth the full agreement with respect to all solicitations by Routh for defendant is silent on a package deal. By its terms this agreement only speaks of the right of plaintiff to exclusively offer fuel oil to various utilities, including Niagara Mohawk. When on April 13, 1971 Weinand wrote to terminate the brokerage relationship with Routh, it was the December 8, 1968 agreement (as incorporated into Routh's June 26, 1969 letter modifying and reconfirming the same) which was sought to be cancelled. Thus, by Weinand's own implicit admission, the relationship between the parties did not turn on the procurement of a package deal.

Other evidence adduced supports this determination. Although Carey and Weinand claimed that Routh's obtaining a package deal was a prerequisite to the payment of his commissions, they conceded that at no time was either Routh or Stephens apprised of this condition. Even if defendant was unaware of Niagara Mohawk's rejection of the package deal until Connolly's receipt of the draft agreement from Niagara Mohawk in December 1969 (which I find totally incredible)[7] it nevertheless continued to figure in the five cents per barrel commission

---

**6.** Carey conceded this to be the case but explained that the contractual arrangement was modified by a "working relationship that develops over a long period of time." In any event, the fuel oil and throughput agreements between Con Edison and defendant evidence a unique type of agreement unlike the package deal purportedly proposed. Indeed, in order for Con Edison to exercise its purchase option, it would have to buy the land as well as the facilities thereon; and with respect to the advantage to the utility of passing on costs

through a fuel adjustment clause, Carey testified that the throughput cost was charged separately from the cost of fuel and transportation so that Con Edison did not, in fact, pass on the same to its customers.

**7.** The record indicates that as early as January 17, 1969, Butler was told to estimate construction costs without figuring in a day tank cost, indicating that defendant would not be owning the facilities.

in the price offered both in Connolly's redraft, and in the final price as set in the June 17, 1970 contracts. Indeed as late as a month prior to the institution of this lawsuit, Weinand, with Carey's approval, was attempting to obtain a reduction of the commissions. If defendant was attempting to renegotiate the commission, notwithstanding that at least the Albany deal was a straight fuel oil supply arrangement, then surely it was defendant's understanding that procurement of a package deal was not vital to the payment of those commissions.

Moreover, Connolly himself admitted that the package concept was a sales device or inducement (or in the more common parlance a "gimmick") to make defendant a more desirable fuel supplier than its competitors. Carey himself stated that, despite his belief that Paxton's May 28, 1969 acceptance of Connolly's Albany fuel oil supply proposal constituted an acceptance of a package deal, he never mentioned this understanding of the deal to O'Neil in 1970. Instead, he testified that his concern at that time was with his oil reserves in a market in which oil was in short supply and high demand, and his having a plant in Albany "would have been one more headache"—tantamount to "an albatross around your neck."

The conclusion is inescapable that, notwithstanding any advantage to defendant of obtaining a package deal,[8] the package deal was offered, and defendant's willingness to engage in this type of arrangement was continually proffered, primarily to protect defendant's competitive position; that is, as a service function to generate long-term oil supply sales. It is equally clear that, by virtue of defendant's own acts and admissions throughout its dealings with Routh, the payment of plaintiff's commission was not dependent upon the procurement of an Albany package deal.

■ The second issue to be resolved is the scope of the agreement. Defendant contends that the agreement as made related solely to Niagara Mohawk's Albany station, and not to Oswego, because Weinand's letter to Routh of July 27, 1967, confirming his commission, specifically referred to Routh's July 5, 1967 offer to Winkworth, which incorporated Routh's June 13, 1967 offer to only supply Niagara Mohawk's Glenmont (Albany) station. Defendant further argues that since the December 8, 1968 agreement between Routh and Weinand—stating that Manhattan's commission with respect to Niagara Mohawk "will be maintained at 5¢ per barrel as agreed to in [Weinand's] letter of August 3, 1967"—only refers to the letter of August 3, 1967 and the letter of August 3 does not expand the reference beyond Albany, the only arrangement between the parties concerned Albany.

The evidence adduced demonstrates, and the December 8, 1968 agreement imports, however, a much less restrictive understanding. When Carey and Routh reached their agreement in May 1967, it was rumored that Niagara Mohawk's Albany station would be converted, but as Winkworth discussed with Routh prior to the June 13, 1967 offer, the Albany location was to be considered first, but the possibility of converting other of Niagara Mohawk's stations was left open. The June 13, 1967 offer was specifically directed at Albany pursuant to Winkworth's request for use in a feasibility study at Albany and to persuade Niagara Mohawk management to convert.

The December 8, 1968 agreement setting forth Routh's complete services on defendant's behalf provided that Routh was to offer "fuel oil exclusively" to Niagara Mohawk as one of various accounts. This account was not limited as to station location, and when Weinand executed and returned the agreement, his cover letter merely referred to Routh's "soliciting residual fuel outlets" for defendant. Although he made a change in the language of the

---

8. Carey testified that he wanted a terminal in the Albany area so as to service other customers from that location, but did not ask O'Neil if he could lease the Niagara Mohawk facility. Instead, he obtained what he desired through "the back door," by virtue of a terminal arrangement at Oswego contained in the Oswego fuel supply contract of June 17, 1970.

agreement, he at no time limited the outlet in question to its Albany station. In light of his testimony that although he could not recall who told him, he was apprised of the possibility of an Oswego conversion in either 1967 or 1968, it was well within his power to delimit the arrangement with Routh at that point.

Connolly also indicated that he knew in late 1968 that Niagara Mohawk was considering converting more than Albany, and consequently, in August 1969, he supplied the price to be used in the Oswego feasibility study. Although the earliest that Carey could recall being apprised of Oswego's candidacy for conversion was the summer of 1969, he did indicate that Weinand, and then Connolly, were in charge of the Niagara Mohawk deal, and that Carey, occupied with other matters, was not "paying the greatest attention to the Niagara Mohawk account."

It is thus apparent that the agreement between Routh and defendant was for the solicitation of an account with certain fuel needs. Thus, the initial offer was directed at Albany because Winkworth had indicated a concern merely with that location, but the possibility that other locations would be involved was always a consideration. Thus, nowhere did Weinand specifically limit the solicitation to Albany; Routh was to solicit an "account," not a location, and the agreement between Routh and defendant was broad and clear enough to encompass that account's fuel needs as they expanded.

In any event, conversion at Oswego was not an unforeseen occurrence; defendant was aware of that possibility even while the arrangement with Routh was being finalized, yet took no steps to limit that arrangement accordingly. On no occasion was either Routh or Stephens told that the agreement did not cover Oswego; to the contrary, their efforts directed at obtaining that business were known by and acquiesced in by defendant. When on May 13, 1969, at the meeting in Syracuse, Weinand and Paxton shook hands on the Albany deal, the conclusion is irresistible that the group enthusiastically chorused "on to Oswego," perhaps only some vocally but obviously all mentally.

Furthermore, when Weinand attempted to reduce plaintiff's commissions, his attempts covered both the Albany and Oswego business. Just as this purported renegotiation suggests defendant's recognition that obtaining a package deal was not a necessity, so too it indicates defendant's understanding that its obligation to pay commissions extended to Oswego deliveries. If the agreement between the parties indicating the inclusion of Oswego is ambiguous, then the above conduct of defendant, practically construing the agreement, clearly resolves any ambiguity in favor of plaintiff. See *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 842 (2d Cir. 1975).

Defendant's final contention with regard to liability is that plaintiff failed to prove that the June 17, 1970 contracts with Niagara Mohawk resulted from Routh's efforts. This contention is twofold: that Routh was not granted an exclusive agency or exclusive right to sell with respect to the Niagara Mohawk solicitation so that defendant was free to obtain that business without obligation to plaintiff, and that, in any event, the deal negotiated by Routh collapsed and thereafter defendant independently obtained a different deal as represented by the June contracts.

It is clear that if Routh was granted an exclusive agency, defendant would be free to sell itself, without incurring liability for commissions; but if he were granted an exclusive right to sell, defendant would be liable for commissions even if it made the sale. See *Barnit v. Cannizzaro*, 3 A.D.2d 745, 160 N.Y.S.2d 329 (2d Dept. 1957); *Bagley v. Butler*, 59 Misc.2d 1029, 301 N.Y.S.2d 148 (Rensselaer Co. 1969); 6 N.Y.Jur. Brokers § 130. The December 8, 1968 agreement executed by Weinand and Routh expressly provides that plaintiff was to offer "fuel oil exclusively to" Niagara Mohawk. That the word "exclusively" could not possibly be construed as modifying "fuel oil" is patent since it has been defendant's consistent position that Routh was to offer more than just fuel oil to that utility. The only possible interpre-

tation to be gleaned from the clear language of that provision is that plaintiff was to be defendant's exclusive agent vis-a-vis the Niagara Mohawk business. That this exclusivity extended to the right to sell is manifest. Not only has defendant failed to point up any factual theory in support of its position, but the evidence adduced satisfies plaintiff's burden of proof overwhelmingly in this respect. It is hornbook law that

> . . . where a broker has been specifically employed to negotiate a contract with a designated party, without reservation by the principal of the right to conduct independent negotiations with the same party, the rule that a party employing a broker to sell property may nevertheless negotiate the sale himself without incurring liability to the broker is inapplicable. (footnotes omitted)

6 N.Y.Jur. Brokers § 130. *See also Carns v. Bassick*, 187 App.Div. 280, 283–84, 175 N.Y.S. 670 (1st Dept. 1919).

Thus, defendant's contentions that Routh was not granted an exclusive right to sell, much less an exclusive agency, and cases cited for the proposition that in the absence of the latter, a principal is free to compete with the agent for a sale with impunity, are inapposite.

█ In any event, defendant's alternative contention is likewise insubstantial. The evidence clearly demonstrates that the contracts proximately resulted from Routh's efforts. *See Eugene J. Busher Co. v. Galbreath-Ruffin Realty Co., Inc.*, 22 A.D.2d 879, 254 N.Y.S.2d 673 (1st Dept. 1964); *aff'd* 15 N.Y.2d 992, 260 N.Y.S.2d 12, 207 N.E.2d 608 (1965); *Bellesheim v. Palm*, 54 App.Div. 77, 79, 66 N.Y.S. 273 (2d Dept. 1900). Routh brought defendant and Niagara Mohawk together, he expended considerable time and effort in obtaining and supplying quotations and other information for use in Niagara Mohawk's decision to convert its Albany and Oswego stations, he arranged and attended meetings to facilitate those conversions, and he was instrumental in suggesting methods of delivery to Oswego. Carey begrudgingly admitted that Routh had "contributed" to the final

Albany contract, and Connolly conceded that Routh regularly participated until his exclusion from the final negotiations in June 1970.

That Routh was not involved in the final stages of negotiation is not disputed. However, it is obvious that his continuous efforts on defendant's behalf over a three year period led to the execution of those agreements, despite his later absence. Weinand admitted that the final base price included plaintiff's commission; and defendant's subsequent attempt to renegotiate the commissions is compelling evidence that it was understood that they had been earned.

Moreover, the final Albany and Oswego contracts reflected Routh's efforts, even as to those provisions which defendant claims it independently procured. The $2.05 Albany base price, like the $1.82 price originally quoted Niagara Mohawk by Routh on June 13, 1967, was, according to Carey, a few cents below the posted price; and Carey testified that the price contained in the Oswego contract equalled the Albany base price plus a transportation differential. In any event, Routh was instrumental in getting Niagara Mohawk to agree to a price increase at Albany. The Oswego contract contained a provision relating to the construction of facilities at that location; by implementing Routh's suggestion of a pipeline from Oswego to Albany, defendant satisfied whatever desire it may have had for locating its facilities at Albany.[9] And it is clear that Routh continually offered defendant's services in the construction of such facilities to induce obtaining that business.

That Routh played no part in obtaining those provisions in the final contracts relating to the price escalation is conceded. Nor could he have, for he was specifically and intentionally kept ignorant of this provision at defendant's urging. It was at Connolly's request, acceded to by Niagara Mohawk, that Routh was not apprised of, and excluded from, the final negotiations beginning in June 1970. Thus, it was at defendant's own urging that Routh was precluded from per-

**9.** See footnote 8, *supra*.

sonally seeing the deal through to the very end. It is well-settled that a principal's interference with the opportunity of its broker to complete his services does not bar the broker's right to his commissions. *Simon v. Electrospace Corp.*, 28 N.Y.2d 140, 320 N.Y. S.2d 225, 269 N.E.2d 21 (1971). *See Weniger v. Union Center Plaza Associates*, 387 F.Supp. 849, 862 (S.D.N.Y.1974) *quoting Lane Real Estate Department Store v. Lawlet Corp.*, 28 N.Y.2d 36, 42–43, 319 N.Y. S.2d 836, 268 N.E.2d 635 (1971). Thus, under the circumstances here presented, Routh was the procuring cause of the Niagara Mohawk contracts, and his failure to participate in the last stages of the negotiations would not preclude plaintiff's entitlement to commissions.

### III.

Having thus resolved the question of liability in plaintiff's favor, I turn now to a consideration of damages. The agreement between the parties provided that plaintiff was to receive a commission of five cents per barrel for every barrel of oil delivered Niagara Mohawk for the original term of the contracts between Niagara Mohawk and defendant. The original terms of the Niagara contracts are ten years with respect to Albany, and fifteen years with respect to Oswego, and plaintiff is entitled, as damages, to a five cents per barrel commission resulting from oil deliveries for those periods of time.

It is agreed that through October 31, 1976, a total of 41,279,439 barrels of oil were delivered by defendant to the Albany and Oswego stations under the Niagara Mohawk contracts; plaintiff is thus entitled to commissions thereon of $2,063,971.95. To facilitate the determination of plaintiff's commissions on all barrels delivered after October 31, 1976, defendant is directed to render an immediate accounting to plaintiff of all oil delivered under the contracts from November 1, 1976 through August 31, 1977, and to continue to account on a monthly basis to plaintiff for all deliveries the prior month for the life of the contract. Plaintiff's entitlement to commissions for oil delivered through July 31, 1977 shall accrue immediately; thereafter, plaintiff's five cents per barrel commission shall be deemed to accrue on the last day of the month following the last day of the month of delivery.

In addition, since New York law mandates an award of prejudgment interest in breach of contract cases, N.Y.C.P.L.R. § 5001; *see also United Bank, Ltd. v. Cosmic International, Inc.*, 542 F.2d 868, 878 (2d Cir. 1976), plaintiff is entitled to interest from the date of accrual of its cause of action. Treating these commissions as payable monthly—which treatment defendant has not contested—accruing one month following the last day of the month of delivery, plaintiff is entitled to interest computed from September 31, 1970 (the last day of the month following the month of the first oil deliveries to Albany) and thereafter on the accrual date of each commission payment, calculated at a rate of 7½ percent per annum through August 31, 1972 and 6 percent thereafter. N.Y.C.R.L.R. § 5004; *United Bank, Ltd. v. Cosmic International, Inc., supra* at 879.

Plaintiff's request for an award of attorneys' fees is denied.

Settle judgment on five days' notice.