Argued and submitted June 21, affirmed August 3, petition for review denied October 18, 1994 (320 Or 272)

Linda STIRLING-WANNER,
*Appellant,*

*v.*

POCKET NOVELS, INC.,
an Oregon corporation
fka AnyTime Pee-Wee Novels, Inc.,
aka PeeWee Books, aka DimeNovels;
Randel L. Byrd; Dime Store Novels, Inc.,
an Oregon corporation, aka DimeNovels;
WLM Enterprises, Inc., an Oregon corporation
and Win McCormack,
*Defendants,*

*and*

Joyce BYRD,
*Respondent.*

(9203-01461; CA A79311)

879 P2d 210

Richard S. Yugler argued the cause and filed the briefs for appellant.

Thomas A. Bittner argued the cause for respondent. With him on the brief was Schulte, Anderson, DeFrancq, Downes & Carter, P.C.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

EDMONDS, J.

## EDMONDS, J.

Plaintiff appeals from a judgment granting defendant Joyce Byrd's (defendant) motion for a directed verdict at the close of plaintiff's evidence.[1] ORCP 60. Defendant makes a cross-assignment of error, arguing that the trial court erred in not granting a directed verdict in her favor on a different basis. We affirm.

This case involves plaintiff's claim for unpaid wages while she was employed by Pocket Novels, Inc. (Pocket Novels). Plaintiff alleges that defendant is liable for the claim because defendant and her son, Randel Byrd (Randel), made a fraudulent transfer of Pocket Novels' assets to a shell corporation, Dime Store Novels, Inc. (Dime Store), formed by defendant and Randel. At trial, plaintiff offered evidence that, in March, 1990, she was hired by Randel to work as editor-in-chief for Pocket Novels. Pocket Novels' business was to publish miniature pulp fiction paperback books. Randel was the sole shareholder of Pocket Novels. Defendant worked for Pocket Novels on a limited basis, primarily as an editor. Pocket Novels also sold "writer's guidelines" to anyone interested in writing stories for publication by Pocket Novels. The writer's guidelines were developed by plaintiff while working for Pocket Novels and were sold with several sample books to prospective authors.

During 1990, Pocket Novels obtained financing of $250,000 from WLM Enterprises, Inc., and Win McCormack. The financing agreement required Randel to raise an additional two million dollars from other investors or relinquish the business to McCormack for a nominal sum. By March, 1991, it had become apparent to Randel that he was not going to be able to raise the necessary funds. In order to prevent McCormack from taking control of Pocket Novels' assets, Randel decided to form a new corporation.

In June, 1991, Dime Store was incorporated by Randel. It is unclear whether defendant participated in the formation of the corporation. However, in July, 1991, she

---

[1] Joyce Byrd is the only respondent. Previously, the trial court granted a default judgment against defendants Pocket Novels, Inc., Randel Byrd, and Dime Store Novels, Inc., and a judgment in favor of defendants WLM Enterprises, Inc., and McCormack.

purchased 100 percent of the stock in Dime Store by investing $5,000. She would later invest an additional $37,000 in the corporation. Also, in June, 1991, plaintiff quit her job with Pocket Novels. At that time, it owed her approximately $70,000 in unpaid salary.

The major assets of Pocket Novels were the corporate logo, the writer's guidelines and a unique retail display pack. Dime Store commenced doing business with Pocket Novels' assets without a formal transfer of assets or liabilities from Pocket Novels. It operated until January, 1992, when McCormack obtained an injunction, enjoining it from using the property of Pocket Novels, including logos, guidelines, books and the display pack. Shortly thereafter, Dime Store ceased to do business.

In March, 1992, plaintiff brought this action to recover her unpaid salary. She also sought punitive damages and attorney fees. In July, 1992, she obtained a default judgment for $95,302 against Randel, Pocket Novels and Dime Store. The parties agree that plaintiff's judgment against Randel, Pocket Novels and Dime Store is uncollectible. Plaintiff then sought to hold defendant personally liable for the judgment against Dime Store. She argued that Dime Store was the alter ego of defendant and Randel and that its corporate veil should be pierced. The trial court granted defendant's motion for a directed verdict. It ruled that

> "there is no evidence from which this jury could conclude that [defendant] has engaged in improper conduct which caused [plaintiff's] ability to collect her debt from either [Pocket Novels or Dime Store] to be impaired."

On review, we view the evidence in the light most favorable to plaintiff as the non-moving party, and we extend to plaintiff the benefit of every reasonable inference that may be drawn from the evidence. We must determine if there was evidence sufficient to warrant submission of the case to the jury. *Shockey v. City of Portland*, 313 Or 414, 433, 837 P2d 505 (1992), *cert den* ____ US ____, 113 S Ct 1813 (1993).

For purposes of this opinion, we assume that plaintiff is a creditor of Dime Store. To prevail in her claim against defendant, she must still show that defendant was in control of the corporation, that defendant engaged in misconduct,

and that that misconduct resulted in plaintiff's inability to collect from the corporation. *Amfac Foods v. Int'l Systems*, 294 Or 94, 108, 654 P2d 1092 (1982). Plaintiff makes a number of arguments citing wrongdoing by defendant. Only three of them warrant discussion.

Plaintiff first argues that defendant's participation in the appropriation of Pocket Novels' assets constituted improper conduct that prevented plaintiff from collecting her judgment from Dime Store. The essence of plaintiff's argument is that, because the assets were transferred to Dime Store, plaintiff's ability to collect her salary was impaired. Plaintiff's conclusion does not follow from her premise. Rather, plaintiff's prospect of collecting her salary from Dime Store was enhanced by the transfer. At the time of the transfer, Pocket Novels was insolvent, with at least $325,000 in debts. Dime Store was an operating business in which defendant had invested $42,000 and which was generating an average of $600 per day in gross sales. Moreover, under the Uniform Fraudulent Transfer and Conveyance Act, ORS chapter 95, plaintiff could have had the transfers set aside and then attempted to satisfy her claim from Pocket Novels' assets. Therefore, she was in no worse position than if the transfer had not occurred. Plaintiff has not offered any evidence that would warrant submission of that argument to the jury.

Plaintiff also argues that, because of the size of Pocket Novels' liabilities that were acquired by Dime Store, defendant's investment of $42,000 constituted inadequate capitalization. The gross undercapitalization of a debtor corporation by itself could suffice to hold a shareholder liable to a creditor who is unable to collect against the corporation because of inadequate capitalization. *Amfac Foods v. Int'l Systems, supra*, 294 Or at 109. Whether a corporation has sufficient capital to cover its reasonably anticipated liabilities is measured by the nature and magnitude of its undertaking, the risks attendant to the particular enterprise and the normal operating costs associated with its business. The sufficiency of capital is determined at the time a corporation is formed and in the beginning of its operation. *See Gardner v. First Escrow Corp.*, 72 Or App 715, 696 P2d 1172, *rev den* 299 Or 314 (1985).

Even if the debts of Pocket Novels could be legally imputed to Dime Store because of the fraudulent transfer, it does not necessarily follow that Dime Store was inadequately capitalized. Defendant infused $42,000 into the corporation during the seven months that it operated. However, the corporation ceased to do business as a result of the injunction obtained by McCormack. Moreover, plaintiff offered no evidence as to the value of the assets received from Pocket Novels, which must necessarily be considered in determining whether Dime Store was grossly undercapitalized. We conclude that plaintiff has not presented any evidence that her inability to collect her claim against Dime Store is the result of the purported inadequacy of defendant's investment.

■ Finally, plaintiff points to the purported "milking" of Dime Store's assets as misconduct on the part of defendant. Defendant worked as an employee of Dime Store but received no salary. Because defendant's residence was in Bend, Oregon, Dime Store paid $600 per month for four months for an apartment in Portland as a temporary residence for defendant. In the light of the fact that defendant received no salary, that evidence does not raise an issue of fact about whether defendant "milked" the corporation of its profits.

Plaintiff also argues that the assets were "milked" because Dime Store paid the rent on Randel's apartment. The only evidence that defendant points to in support of that argument is the testimony that

> "[Randel] obviously received enough money to pay for his apartment and to pay for his activities outside the office."

While the payment of an excessive salary could constitute the milking of corporate assets, *see Amfac Foods v. Int'l Systems, supra,* 294 Or at 109, there is no evidence in the record as to the amounts that Randel withdrew from Dime Store or how defendant aided Randel in that regard. Again, plaintiff's evidence fails to raise an issue of fact about defendant "milking" the corporation of its profits.

The trial court did not err when it ruled that there was no evidence that defendant's conduct impaired plaintiff's ability to collect her claim. Plaintiff is not entitled to pierce Dime Store's corporate veil in order to collect her judgment against defendant personally. Because of our resolution of the

appeal, we need not address defendant's cross-assignment of error.

Affirmed.