Argued and submitted January; resubmitted en banc November 9, 2000, affirmed January 24, 2001

# Lauren A. VUYLSTEKE,
*Respondent,*

*v.*

# Cynthia BROAN
# and Cynthia Broan, Inc.,
*Appellants.*

# (9711-08966; CA A104585)

17 P3d 1072

Gregory W. Byrne argued the cause and filed the briefs for appellants.

Timothy W. Grabe argued the cause and filed the brief for respondent.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, and Brewer, Judges.

EDMONDS, J.

## EDMONDS, J.

Defendants appeal from a judgment for plaintiff for $74,012 on her breach of contract claim after the parties waived a jury trial.[1] They make the following assignments of error: The trial court erred (1) when it denied defendant Cynthia Broan's pre- and mid-trial motions requesting that the court rule that it had no jurisdiction over the corporate defendant; (2) when it denied defendant Cynthia Broan's pretrial motion and her motion at the end of plaintiff's case-in-chief requesting a ruling that the court lacked personal jurisdiction over her; (3) when it pierced the defendant corporation's corporate veil and held Cynthia Broan personally liable; (4) when it failed to hold plaintiff's employment contract void under the New York Statute of Frauds; and (5) when it failed to rule that plaintiff did not undertake reasonable measures to mitigate her damages. We affirm.

There is evidence from which the trial court could have found that Broan and plaintiff had a series of discussions that resulted in an employment contract. Plaintiff lived in Portland. Broan lived in Oregon from 1990 until March 1997 until she moved to New York City. Broan intended to open and operate an art gallery there and incorporated Cynthia Broan, Inc., for that purpose. Broan contracted with plaintiff to manage the gallery. To begin work, plaintiff had to move to New York. Before she started working, defendants repudiated the contract, leading to this litigation.

We turn first to defendants' third assignment of error—that the trial court erred by piercing the corporate veil and holding defendant Broan personally liable. The trial court ruled that "there was complete disregard of the corporate form" and that "there is less cash and less liquid asset in the corporation than this judgment." Defendants rely on *Amfac Foods v. Int'l Systems*, 294 Or 94, 654 P2d 1092 (1982). In *Amfac Foods*, the court said:

"When a plaintiff seeks to collect a corporate debt from a shareholder by virtue of the shareholder's control over the debtor corporation rather than on some other theory, the

---

[1] The trial court found against plaintiff on her promissory fraud claim.

plaintiff must allege and prove not only that the debtor corporation was under the actual control of the shareholder but also that the plaintiff's inability to collect from the corporation resulted from some form of improper conduct on the part of the shareholder. This causation requirement has two implications. The shareholder's alleged control over the corporation must not be only potential but must actually have been exercised in a manner either causing the plaintiff to enter the transaction with the corporation or causing the corporation's default on the transaction or a resulting obligation. Likewise, the shareholder's conduct must have been improper either in relation to the plaintiff's entering the transaction or in preventing or interfering with the corporation's performance or ability to perform its obligations toward the plaintiff." *Id.* at 108-09.

Defendants argue that there is insufficient evidence that Broan engaged in improper conduct in the exercise of her control over the corporate defendant or that any improper conduct caused plaintiff to be unable to obtain a remedy from the corporation. Defendants point to testimony that the corporation was initially capitalized with $124,000 in cash and $30,000 to $50,000 in artwork and assets, and that Cynthia Broan, Inc., is duly incorporated under New York law.[2] Plaintiff counters that Broan, the sole shareholder of the corporation, engaged in improper conduct by disregarding corporate roles and formalities, such as failing to have a board of directors, corporate minutes, and a corporate bank account at the time that the contract was entered into with plaintiff. She also points to testimony from Broan that when the contract was made, no money had been invested in the corporation. The capitalization discussed above did not occur until six months before trial. Also, testimony established that Broan projected annual costs exceeding $320,000 for the business during the negotiations with plaintiff. As of the trial date, the business was averaging $2,500 a month in sales, had incurred $100,000 in start-up costs and had a yearly budget of $150,000. Plaintiff's promised salary was $72,000 in addition to an $8,000 signing bonus.

---

[2] Defendants do not argue that there is a "choice of law" issue between New York and Oregon law that must be considered in the resolution of this assignment. Rather, they argue that the issue is controlled by Oregon law.

■ Broan testified that she was the only individual who dealt with plaintiff on behalf of the corporation. She said that she formed the corporation specifically for the purpose of operating the gallery and that she expressly made the corporation a party to plaintiff's employment contract. Those facts satisfy the *Amfac* requirement that Broan's control over the corporation was exercised in a manner to cause plaintiff to enter into the transaction with the corporation. Additionally, Broan's failure to capitalize the corporation at the time that the contract with plaintiff was entered, in light of the amount of plaintiff's salary, her bonus and the gallery's operating costs, is the kind of gross undercapitalization that permits a court to pierce the corporate veil. *See Stirling-Wanner v. Pocket Novels, Inc.*, 129 Or App 337, 341, 879 P2d 210 (1994) (noting that the sufficiency of capital is determined at the time a corporation is formed and at the beginning of its operation). We conclude for the above reasons that the trial court did not err in piercing the corporate veil and holding Broan personally liable.

We now turn to defendants' first and second assignments of error. In their first assignment of error, defendants challenge the trial court's jurisdictional ruling as to the corporate defendant. In the second assignment of error, Broan challenges the trial court's jurisdictional ruling as to her personally. As we have previously held, the activities of the corporation in Oregon are also the activities of Broan.[3] Thus, we consider the issue of jurisdiction as if plaintiff had entered into the contract with Broan personally rather than with the corporation.

■ ORCP 4 establishes the grounds upon which jurisdiction may lie. Because we conclude that the trial court properly ruled that jurisdiction lies under ORCP 4 L, we do not discuss any of the other potential grounds for jurisdiction. ORCP 4 L provides that an Oregon court will have jurisdiction over a party served pursuant to ORCP 7:

---

[3] *See Rice v. Oriental Fireworks Co.*, 75 Or App 627, 707 P2d 1250 (1985), *rev den* 300 Or 546 (1986). *See also Woods v. Jorgensen*, 522 So 2d 935, 936 (Fla App 1988) (holding that utilization of a corporate structure does not preclude personal jurisdiction over the dominant shareholder where the corporate entity is merely the shareholder's alter ego and is used to shield improper conduct).

"Notwithstanding a failure to satisfy the requirement of sections B through K of this rule, in any action where prosecution of the action against a defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States."

In *State ex rel Circus Circus Reno, Inc. v. Pope,* 317 Or 151, 854 P2d 461 (1993), the court adopted the following test for determining whether the exercise of jurisdiction under ORCP 4 L over a non-Oregon defendant exists:

"First, the defendant must have 'minimum contacts' with the forum state. 'Minimum contacts' will be found where the defendant has 'purposefully directed' its activities at residents of the forum state *and* where litigation 'arises out of or relates to' those activities. * * * Second, even if minimum contacts exist, the exercise of jurisdiction must be reasonable; in the light of various factors deemed relevant by the Court, the exercise of jurisdiction must comport with 'fair play and substantial justice.'" 317 Or at 159-60 (quoting *Burger King Corp. v. Rudzewicz,* 471 US 462, 472, 476-77, 105 S Ct 2174, 85 L Ed 2d 528 (1985)) (emphasis in original; citation omitted).

Initially, Broan raised the issue of personal jurisdiction under ORCP 21 A. For purposes of deciding an ORCP 21 A motion, our standard of review requires us to assume that the facts alleged by plaintiff in her complaint are true. *Friedrich v. Adesman,* 146 Or App 624, 626, 934 P2d 587 (1997). In addition, plaintiff filed an affidavit that supports the allegations in her complaint, and Broan filed two affidavits in support of her motion, all in accordance with ORCP 21 A.[4] Having before it all of the affidavits and the complaint, the trial court ruled that Broan's contacts with plaintiff "constituted minimum contacts with the State of Oregon."

---

[4] ORCP 21 A provides, in part,

"If, on a motion to dismiss asserting defenses (1) through (7), the facts constituting such defenses do not appear on the face of the pleading and matters outside the pleading including affidavits and other evidence, are presented to the court, all parties shall be given a reasonable opportunity to present evidence and affidavits, and the court may determine the existence or nonexistence of such facts supporting such defense or may defer such determination until further discovery or until trial on the merits."

The second ground for a motion to dismiss under ORCP 21 is for "lack of jurisdiction over the person."

Although the parties' affidavits tend to controvert each other in some particulars, we understand the court's ruling to be that within those materials there are sufficient facts, when viewed in the light most favorable to plaintiff, to meet the requirements of ORCP 4 L.[5]

In plaintiff's affidavit, she avers, in part:

"1. I am the plaintiff in this action. The facts set forth herein are based on personal knowledge.

"2. During the summer of 1997 and through October 1997, defendant Cynthia Broan made approximately three telephone calls from New York to my residence in Oregon, and solicited me to leave my residence in Oregon and become employed by Cynthia Broan Inc., a newly formed New York Corporation. Ms. Broan sought my services because of my background and expertise in the art marketing field. The first solicitation call to me in Oregon was made by an artist with whom Ms. Broan works, Ray Colleran. He told me that Ms. Broan wanted to discuss opening a New York art gallery, that he was calling at her behest, and that she wanted me to contact her.

"3. I responded to Ms. Broan's recruitment efforts by informing her that I was interested in returning to the work force after being my childrens' primary caretaker for many years. I informed her that since I was the mother of three children who were attending school in Oregon, she would need to meet certain monetary obligations in order for me to become employed by her company in New York, and I would need to change my children's primary custody through the Oregon courts so that they would be allowed to live with their father in London, England. Ms. Broan promised me in the New York-to-Oregon telephone calls that if I came to New York to work for her, the employment terms would include two additional days off per month along with a monthly summer vacation during which I would be able to visit my children in England. This was important to me in attempting to balance my family and professional life.

---

[5] Defendant's motion did not seek a separate adjudication of jurisdiction as to the counts of breach of contract and fraud. Rather, it focused on the subject of jurisdiction over Broan and the corporate defendant without distinguishing between the two counts.

"4. During the summer of 1997, Ms. Broan informed me by telephone in Oregon that she wanted me to begin employment in New York on January 1, 1998. However, in September 1997, she informed me by telephone in Oregon that her art gallery business was developing quickly and that I would be needed in New York for a November 1, 1997, starting date. At this point, she promised me that if I began employment by her November 1st starting date, she would agree to pay me an annual salary of $72,000 with an $8,000 signing bonus. I informed Ms. Broan that as part of the employment arrangement, and as part of the move to New York, I would need to sign legal documents agreeing to change my childrens' residence and relinquish a substantial amount of child support payments and spousal support under an Oregon divorce decree. I informed her that this would be a major life change for myself, my children, and my ex-husband. Ms. Broan encouraged me to go forward with these steps in order for me to assist her with the new November 1st start-up date. Ms. Broan promised that she would send a contract to me in Oregon setting forth the employment terms.

"5. In reliance on Ms. Broan's promises by telephone to me in Oregon, on September 24, 1997, I signed a stipulated modification of the Oregon divorce decree which changed our childrens' residence to my ex-husband in London, and relinquished over $200,000 in child support and spousal support owed by my ex-husband. The document (attached hereto as Exhibit 3) was then sent to my husband in London for signature and finally signed by an Oregon judge on November 26, 1997.

"6. In October 1997, I accompanied my children to London in order to assist in establishing their new life. While I was in London, Ms. Broan faxed me a document setting forth the terms of employment, which memorialized the earlier promises she had made to me by telephone in Oregon. A copy of the document is attached hereto as Exhibit 4.

"7. Having accepted employment, I then went to New York and provided services to defendants including selecting an appropriate location for the art gallery, formulating a business plan, and educating defendants about the art market. The essence of the business was that defendants supplied the money and I supplied the art-world expertise.

"8. While in New York in October 1997, and after I had provided the services described in paragraph seven, Ms. Broan told me that she had no intention of honoring her promises that she had made to me by telephone in Portland, Oregon.

"9. The representations made to me in Oregon by Ms. Broan were material and false, and it is my belief that Ms. Brown knew the representations were false or was ignorant of their truth, and she intended that I rely on her representations in the manner reasonably contemplated. I was ignorant of the falsity of Ms. Broan's misrepresentations, I relied on their truth, I had a right to rely on their truth, and I was damaged thereby.

"10. I incurred damages in Oregon, including costs for airfare and hotel, renting a car in Portland after I sold my car in reliance of Ms. Broan's misrepresentations, and through loss of over $200,000 originally due under a divorce decree. As a result of Ms. Broan's telephone promises to me in Oregon, I am presently jobless and have lost my financial wherewithal to spend time with my children."

Plaintiff's complaint makes claims for promissory fraud and breach of contract. In her affidavit, plaintiff avers that Broan "promised that she would send a contract to me in Oregon setting forth the employment terms." That statement implies that Broan made fraudulent promises to plaintiff while plaintiff was in Oregon. Plaintiff also says in her affidavit that, "[i]n reliance on [Broan's] promises by telephone to me in Oregon, * * * I signed a stipulated modification of the Oregon divorce decree which changed our childrens' residence * * * and relinquished over $200,000 in child support and spousal support." Thereafter, the stipulation was approved by an Oregon court. Also, plaintiff sought recovery in her complaint of a promised $8,000 signing bonus and an annual $72,000 salary. According to plaintiff's affidavit, she is "presently jobless" as a result of Broan's promises made over the telephone. Additionally, she claimed that she incurred expenses while living in Oregon for airfare, car rental, and hotel costs.

■ Plaintiff's affidavit charges that Broan "purposefully directed" her activities at plaintiff, an Oregon resident, by making fraudulent promises on which plaintiff relied to her

economic detriment and that Broan's fraud engendered consequences in Oregon. It is also clear from the record before the trial court at the time of the motion that the subject of plaintiff's claims "arose out of or [was] related" to Broan's misrepresentations made to plaintiff while she was in Oregon. Finally, the exercise of jurisdiction over Broan is reasonable in light of the above activities in Oregon.

> "By requiring that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign,' the Due Process Clause gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.
>
> "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp.,* 471 US at 472 (citations omitted).

Here, Broan had fair warning that she could become liable in Oregon. According to plaintiff's complaint, Broan contacted an Oregon resident who was in Oregon at the time and sought to induce her by fraudulent promises to move from Oregon to be employed in New York. At a minimum, Broan's alleged attempt to defraud plaintiff, an Oregon resident, by solicitation within Oregon subjected herself to the jurisdiction of the Oregon courts. The trial court did not err in denying Broan's ORCP 21 motion.

We turn to Broan's motion to dismiss plaintiff's case for lack of jurisdiction made at the close of plaintiff's case-in-chief. Broan's motion is governed by ORCP 60.[6] Plaintiff

---

[6] ORCP 60 provides:

"Any party may move for a directed verdict at the close of the evidence offered by an opponent or at the close of all the evidence. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the

offered evidence that Broan began recruiting her to come to New York in late July 1997. Broan made telephone calls to plaintiff for that purpose on July 28, 30, 31, August 28, and September 9 and 29 while plaintiff was in Oregon. Four of those discussions occurred before plaintiff flew to New York to meet with Broan. Plaintiff made eight telephone calls to Broan while in Oregon to discuss Broan's proposal. While in New York, plaintiff testified that "Cynthia offered me a job after lunch, basically, and I accepted. And she reached over the table and shook my hand, and we were both smiling and excited about it." Plaintiff's employment under the agreement was to begin in January 1998 after arrangements had been made for the establishment of the gallery. Broan understood that, if plaintiff accepted her proposal, then plaintiff intended to transfer custody of her children to her former husband. That transfer would require that the children move to London, England. Broan also understood that plaintiff had accepted the offer only because it offered adequate salary and vacation time to permit her to visit her children. According to plaintiff, Broan told plaintiff after their conversation in New York that she would fax or mail "me a contract that reiterated the terms."

By September, plaintiff had returned to Portland. She testified that she continued to discuss with Broan the prospective operation of the gallery, including a lease of premises that Broan was negotiating. Plaintiff said that Broan apologized for not sending the contract to memorialize their agreement but explained that she had been busy dealing with the prospective landlord and getting the business incorporated. Plaintiff's former husband flew to Portland to say goodbye to their children before he left for London. Because plaintiff's employment in New York did not begin until January, the plan had been for the children to stay with plaintiff and to go to London to live with their father at the end of the year after he had found a place to reside. While plaintiff's former husband was in Portland, Broan telephoned plaintiff. She informed plaintiff that the lease for the

court granting a motion for a directed verdict is effective without any assent of the jury. If a motion for directed verdict is made by the party against whom the claim is asserted, the court may, at its discretion, give a judgment of dismissal without prejudice under Rule 54 rather than direct a verdict."

gallery had now been negotiated and requested that plaintiff commence employment in November instead of January. After discussing the matter with her former husband, plaintiff agreed. In reliance on her agreement with Broan, she entered into a stipulated modification of her Oregon dissolution judgment. The modification included a change of custody and the satisfaction of her former husband's support arrearage in the approximate amount of $30,000. Also, plaintiff, at Broan's request, prepared a business plan of operation for the gallery while in Oregon.[7]

In early October, plaintiff flew to London with her children to help them get settled there. By that time, plaintiff testified that she "had given notice on my apartment, and I had sold my car, and I had packed things up, shipped things over for the kids and gotten my things ready to move to New York." While plaintiff was in London, Broan faxed to her a proposed modification of their agreement to which plaintiff agreed. In late October, plaintiff flew from London to New York to look for an apartment. Soon thereafter, Broan repudiated the employment agreement.

■ Broan argues that Oregon courts have no jurisdiction over plaintiff's breach of contract claim because the agreement was ultimately agreed upon outside of Oregon and was to be performed in New York. We find guidance in deciding that argument from our opinion in *Horn v. Seacatcher Fisheries, Inc.*, 128 Or App 585, 876 P2d 352 (1994), *rev den* 320 Or 407, *cert dismissed* 514 US 1048, 115 S Ct 1424, 131 L Ed 2d 307 (1995). There, the defendants, one of which was a Washington corporation, placed advertisements in *The Oregonian* for seamen to work on their fishing vessel. The defendants had never fished in Oregon waters, they were not registered to do business in Oregon, they did not lease or own property in Oregon, and they had no continuing contact with

---

[7] In *State ex rel Academy Press v. Beckett*, 282 Or 701, 581 P2d 496 (1978), an Oregon resident brought an action against an Illinois publisher. A contract between the Oregon resident and the publisher had been negotiated in Illinois and signed by the Oregon resident in Oregon and by the publisher in Illinois. After the execution of the contract, the publisher requested the Oregon resident to make substantial modifications to the manuscript that the Oregon resident had authored. Those modifications were done in Oregon. In holding that the publisher was subject to Oregon's former long-arm jurisdictional statute, the court focused on the Oregon consequences of the publisher's request. *Id.* at 713.

Oregon. Plaintiff, an Oregon resident, responded to their advertisements and was interviewed by their representative in Portland. Subsequently, the defendants offered the plaintiff a job. He accepted the offer and flew to Alaska to join the ship to which he was assigned. While working on board at sea and not in Oregon waters, the plaintiff was injured. He brought a claim for his injuries in Multnomah County Circuit Court, and the defendant moved to dismiss for lack of personal jurisdiction under ORCP 4 L.

We determined that the defendants in *Horn* "purposefully directed" their recruiting activities and hiring activities at Oregon residents. We said that, for purposes of the "minimum contacts" test, "[i]ndeed, those activities are closely analogous to the advertising and solicitation activities that established 'purposeful direction' in [*Circus Circus Reno*]." *Horn*, 128 Or App at 588.[8] Similarly, Broan's extensive solicitation in Oregon of plaintiff in this case is sufficient to demonstrate that Broan purposefully directed her hiring activities to an Oregon resident, and her telephonic recruitment activities satisfy the first prong of the minimum contacts analysis.

After turning to the second prong of the minimum contacts test (whether the litigation arose out of or was related to the defendants' Oregon activities) in *Horn*, we concluded that the defendants' conduct in recruiting and hiring the plaintiff had no substantive relevance to the plaintiff's personal injury claim. We pointed out that the facts pertaining to the creation of his employment relationship were immaterial to the gravamen of his personal injury claim. Rather, his claim arose out of the defendants' failure to provide adequate equipment and instruction in Alaskan and international waters. Moreover, the contacts in Oregon pertained only to the initial offer. In contrast, this case involves a breach of contract claim that arises directly from the promises made during Broan's hiring activities within the state of

---

[8] In *Circus Circus Reno*, an out-of-state business advertised its facilities in Oregon, provided brochures to the plaintiff's Oregon travel agent, provided a toll-free telephone number for Oregon residents and telephoned the plaintiff in Oregon to confirm his hotel reservations.

Oregon. In particular, it was Broan's telephone call to plaintiff in September confirming her intent to hire plaintiff and changing the commencement date of employment to November that resulted in many of plaintiff's claims for damages. It follows that the second requirement of the minimum contacts test is satisfied.

Defendants also rely on *Perkins v. Bartlett Construction Co., Inc.*, 57 Or App 817, 646 P2d 672 (1982). In *Perkins*, the defendant, a Texas corporation, contacted plaintiff, an Oregon resident, in Oregon to discuss working for the defendant in Nigeria. During their telephone conversations, they discussed wages, equipment, working conditions, and taxes. During one of the conversations, the plaintiff accepted the defendant's offer to work in Nigeria. He quit his job, sold his truck, and purchased clothing and supplies for use in Nigeria. He then flew to Texas and on to Nigeria where he worked for six months. During that time, he received only one payroll check, which was dishonored. The plaintiff then brought a wage claim in Oregon. We concluded that the plaintiff's unilateral acts in buying clothes and supplies for work in Nigeria and selling his truck in preparation for the trip did not constitute the important economic consequences necessary for a finding of jurisdiction under *former* ORS 14.035(1)(a). We specifically declined to reach the question of constitutional due process under *World-Wide Volkswagen Corp. v. Woodson*, 444 US 286, 100 S Ct 559, 100 S Ct 580, 62 L Ed 2d 490 (1980). *Perkins*, 57 Or App at 822.

*Former* ORS 14.035(1)(a) created jurisdiction in "any cause of action * * * arising from * * * [t]he transaction of any business within the state[.]" Prior Supreme Court case law had held the phrase "transaction of business within the state" in the statute meant transactions that cause important economic consequences in this state. In contrast, ORCP 4 L adopts the minimum contacts test that was articulated in *World-Wide Volkswagen*. As the court said in *Circus Circus Reno,*

> "ORCP 4 L means, in practice, that an Oregon court has jurisdiction to the limits of due process under the Fourteenth Amendment; the limits are 'an issue of federal law to be decided pursuant to the controlling decisions of the

United States Supreme Court.' " 317 Or at 156 (quoting *State ex rel Jones v. Crookham*, 296 Or 735, 742, 681 P2d 103 (1984) (Linde, J., concurring)).

Accordingly, *Perkins* has no precedential value under ORCP 4 L.

What is left to decide is whether Broan had fair warning that her Oregon activities could submit her to the jurisdiction of an Oregon court in the event that she repudiated her promises and whether the exercise of jurisdiction comports with fair play and substantial justice. As we pointed out in *Horn*, "[t]he 'minimum contacts' analysis defines when the 'reasonable anticipation' requirement is satisfied." 128 Or App at 590. In *Burger King Corp.*, a Florida corporation brought an action in the United States District Court for the Southern District of Florida against two Michigan residents, alleging that they had breached their franchise agreement for their restaurant located in Michigan. The Supreme Court ultimately held that the exercise of *in personam* jurisdiction in Florida over the Michigan residents did not violate the Due Process Clause of the Fourteenth Amendment. The Court first noted that

> "jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that absence of physical contacts can defeat personal jurisdiction there." 471 US at 476 (citations omitted).

The court rejected the notion that personal jurisdiction turns on mechanical tests such as the place of contracting or performance. It said:

> "[W]ith respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing relationships and obligations

with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities." *Id.* at 473, quoting *Travelers Health Assn. v. Virginia*, 339 US 643, 647, 70 S Ct 927, 94 L Ed 1154 (1930)).

The court thereafter explained:

"We have emphasized the need for a 'highly realistic' approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. *It is these factors — prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing — that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.*" *Id.* at 479 (citations omitted; emphasis added).

The court ruled that, although the defendants had never visited Florida, and that although the contract was executed in Michigan and was to be performed in Michigan, the defendants were properly within the jurisdiction of the Florida courts because their "franchise dispute grew directly out of 'a contract which had a *substantial* connection with that State.'" *Id.*

Turning to the facts of this case, it becomes clear that plaintiff's Oregon negotiations with Broan are also sufficient to establish jurisdiction in Oregon. Here, all of the contacts leading up to plaintiff's trip to New York occurred in Oregon. Broan sought to gain economically by reaching out to and soliciting a contract with an Oregon resident. Her contacts with plaintiff while plaintiff was in Oregon were intended to create a continuing relationship, albeit to occur in New York. Nevertheless, it was reasonably foreseeable to her that her activities directed to plaintiff while in Oregon could result in economic consequences within Oregon. Broan was aware that the acceptance of her offer by plaintiff would result in the relocation and the transfer of custody of plaintiff's children and their change of residence to New York. Broan's telephone call in September directly caused an earlier change in residence for both plaintiff and her children

than had been anticipated. Because plaintiff's costs for relocation of everyone involved as well as the release of accrued child and spousal support obligations and a change of legal custody were all foreseeable consequences, they implicated legal rights and obligations under Oregon law. We conclude that Broan's contacts with the state were substantial and that she had fair warning that she could be subject to the jurisdiction of the Oregon courts. In short, we hold that Broan is not able to avoid the consequences of her Oregon activities merely because the agreement was executed electronically and was to be performed outside of Oregon. We conclude that all of the requirements of ORCP 4 L are met in this case and that the trial court properly ruled that it had personal jurisdiction over defendants.[9]

In defendants' fourth assignment of error, they argue that the trial court erred when it ruled that the New York Statute of Frauds did not render the parties' contract unenforceable. The trial court ruled that the contract was capable of being performed within a year and, therefore, was not governed by the statute. Defendants argue that the fax sent by Broan to plaintiff in London describes employment that was to begin on November 4, 1997, for a period of one year. Because the acceptance to the fax was made on October 20, 1997, it follows, according to defendants, that performance could not occur within one year from its making. Additionally, defendants argue that the New York Statute of Frauds requires a writing to be "subscribed" and that the fax lacks defendants' subscription.[10]

---

[9] We find further support for our conclusion in the case law of other states that have applied federal constitutional analysis to out-of-state employment contracts. For example, in *Aetna Casualty and Surety Company v. Crowther, Inc.*, 221 Ill App 3d 275, 581 NE 2d 833 (1991), an Illinois appellate court determined that where a Florida employer contacted the plaintiffs in Illinois, offered employment in Florida, and arranged for their transportation to Florida to work, personal jurisdiction existed over the employer in Illinois. In that case, the defendant initiated the transaction from Florida, communicated the offer indirectly to one plaintiff through his father, and performance was to occur in Florida. The court concluded that, under the federal due process standard, it was not unreasonable for the insurer of the Florida employer to have expected to defend on its policy in Illinois arising out of its insured's activities in Illinois.

[10] Defendants appear to be attacking only the faxed document's validity; there is no assertion by plaintiff that the "handshake" deal over lunch in New York is enforceable.

Plaintiff responds that Broan conceded the making of the contract when she acknowledged at trial having written the faxed document and that, therefore, this case is not governed by the Statute of Frauds. Alternatively, plaintiff responds that the cover sheet of the fax contained a subscription and that the cover sheet and the contract can be read together to satisfy the Statute of Frauds.

■ We first note that the New York Statute of Frauds would ordinarily apply to the facts in this case, because the contract was for employment for a term of one year, and the employment was to begin in the future. New York law holds that when a contract for employment for one year is to commence in the future, it is within the Statute of Frauds. *Whitehill v. Maimonides School*, 384 NYS2d 818, 53 AD2d 568 (1976) (holding that an unwritten contract of employment made on July 6, 1973, with performance to commence as of August 1, 1973, and be completed on July 31, 1974, violated the Statute of Frauds); *see also Lonsdale v. J.A. Migel, Inc.*, 225 NYS 593, 222 AD 197 (1927) (holding that an oral contract made in June for one year's services to commence the following January was void).

■ New York law does provide for an exception to its Statute of Frauds when the contract's existence is conceded either in writing or at trial. In *Morris Cohon & Co. v. Russell*, 23 NY2d 569, 245 NE2d 712 (1969), the New York Court of Appeals ruled that the memorandum involved in that case was inadequately subscribed to satisfy the Statute of Frauds, because it was not signed by a lawful agent of the defendant. Nonetheless, the court held that the memorandum was sufficient to establish a binding contract, because a clause in the contract itself constituted an admission by the defendant that the plaintiff had performed services for him and that he had an obligation to pay the plaintiff for those services. The court said:

"The Statute of Frauds was designed to guard against the peril of perjury; to prevent the enforcement of unfounded fraudulent claims. But, as Professor Williston observed: 'The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking

integrity; *nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made.'* " *Morris Cohon & Co.*, 23 NY2d at 574 (emphasis added).

In *Tallini v. Business Air, Inc.*, 538 NYS2d 664, 148 AD2d 828 (1989), the court discussed the holding in *Morris Cohen & Co.* and declined to follow it because the essential terms of the contract in that case were in dispute. The *Tallini* court also distinguished the holding in *Manhattan Fuel Co., Inc. v. New England Petroleum*, 422 F Supp 797 (SDNY 1976), *adhered to* 439 F Supp 959 (1977), *affirmed* 578 F2d 1368 (2nd Cir 1978), in which, under *Morris Cohon*, the court held that an ambiguity in the parties' agreement expressed in letters exchanged by them could be resolved by parol evidence, and the Statute of Frauds did not bar enforcement.

■ Based on the above authority, we turn to the facts of this case. The first paragraph of the document that Broan faxed to plaintiff reads:

> "Cynthia Broan, Inc. agrees to employ Lauren Vuylsteke as Assistant Director of the art gallery the corporation is currently founding. *A formal contract will be drafted after this initial agreement is accepted.* This offer will provide employment for one year, and may be renewed for a second year by mutual agreement[.]" (Emphasis added.)

The above language, drafted by Broan and faxed to plaintiff, shows that defendants intended to create an agreement with the document.

Further, Broan testified:

"Q. In faxing this document to [plaintiff], did you intend for her to act on that by coming to New York to work for you?

"A. Yes, I did.

"Q. Okay. And you had agreed to those terms, hadn't you?

"A. I had, but this was a precedent to a formal contract that would be forthcoming.

"Q. But you had still agreed to those terms, correct?

"A. I had.

"Q. Okay. And you inserted this provision here, a reference [to] the formal contract. You actually cannot think of any other term that you left out; isn't that right?

"A. I hadn't met with a lawyer yet to advise me how to write a contract.

"Q. Okay. But there's no specific term that you can think of that you would have wanted changed in the later formal contract; is that true?

"A. That's why I needed to see a lawyer.

"Q. Having now seen a lawyer, and all this time having passed, is there now a term that you would have added that you left out of that?

"A. I have not seen a lawyer about an employment agreement with anyone.

"* * * * *

"Q. The first sentence of this says, 'Cynthia Broan, Inc. agrees to hire [plaintiff] as assistant director of the art gallery the corporation's currently handling.' Did you view that as a promise that should be kept?

"A. Yes, I did."

In light of the content of the faxed document and the evidence of Broan's implied and express admissions that the fax contained all of the essential terms to which she had agreed, we conclude that the agreement is not rendered unenforceable by the New York Statute of Frauds.

■ In their fifth assignment of error, defendants argue that the trial court erred in awarding damages to plaintiff that were, in defendants' opinion, avoidable. They further state that our standard of review is for errors of law and that, regarding the duty of a party injured by a contract to use reasonable efforts to mitigate damages, the laws of New York and Oregon are "equivalent." Defendants point to a number of factual circumstances in the record where they suggest that mitigation should have occurred. Particularly, they argue that plaintiff should have moved to set aside her stipulation to the modification of the dissolution judgment and that she should have sought a work permit in London.

■ The trial court ruled:

"I find that under the circumstances, it was not unreasonable * * * to choose * * * to move to London. * * *

"* * * I do think that they are sufficient to make reasonable not obtaining employment of [$]25,000 in the United States, which I find to be reasonably available to the plaintiff.

"* * * [T]he plaintiff has not failed to mitigate damages * * *.

"So, I have $72,000, having found that the plaintiff made reasonable efforts to mitigate and was unable to find employment, shipping goods to London of $2,012 which comes to $74,012. And I'm not persuaded by the other damages."

When the trial court expressly or implicitly rejected defendants' arguments, we conclude that it did so as a factfinder. The question of whether a plaintiff properly mitigated damages is a question of fact. *Zimmerman v. Ausland*, 266 Or 427, 436, 513 P2d 1167 (1973). An appellate court cannot reject the findings of fact of a trial court after a trial to the court unless the appellate court "can affirmatively say that there is no evidence to support the fact found by the trial court." *Illingworth v. Bushong*, 297 Or 675, 694, 688 P2d 379 (1984). Here, there is evidence in the record to support the trial court's findings. Consequently, defendants' arguments fail.

Affirmed.