Argued and submitted September 4, 2002, judgment reversed in part; otherwise affirmed May 15, 2003

Asa GEMIGNANI
and Gregory Gemignani,
*Respondents,*

*v.*

Tenos M. PETE,
*Appellant.*

99-CV-0233-AB; A114364 (Control)

Benjamin A. GOLDING
and Frances T. Golding,
as Trustees of the Golding Trust,
*Respondents,*

*v.*

Tenos M. PETE,
*Appellant.*

99-CV-0241-MS; A114576
(Cases Consolidated)

71 P3d 87

Martin M. Fisher argued the cause for appellant. With him on the briefs were Lawrence M. Gorman and Lage Fisher Emerson, LLP.

Steven D. Bryant argued the cause for respondents. With him on the brief was Bryant, Emerson & Fitch.

Before Landau, Presiding Judge, and Armstrong and Wollheim, Judges.

LANDAU, P. J.

Armstrong, J., concurring in part, dissenting in part.

## LANDAU, P. J.

In these consolidated cases, defendant appeals two judgments awarding damages to plaintiffs for violation of the Unlawful Trade Practices Act (UTPA), ORS 646.605 to 646.656, and for breach of contract. He argues that the trial court should have granted his motions for directed verdicts as to both claims in both cases. We conclude that the trial court erred in failing to direct a verdict as to a claim for violation of the UTPA in one case, but otherwise affirm.

We state the facts in the light most favorable to the party that obtained the verdict. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). Defendant was the sole owner and shareholder of T.M. Pete Enterprises, Inc. (corporation), which developed commercial and residential real estate. In 1991, the corporation began construction on the Phoenix Park subdivision, but, due to zoning disputes, the project did not begin in earnest until 1996. Plaintiffs Benjamin and Frances Golding and Asa and Gregory Gemignani purchased two lots in the subdivision. We begin with the Golding property.

On October 2, 1996, the Goldings purchased a lot in the Phoenix Park development for $52,200. Approximately three weeks later, they entered into a contract with the corporation for the construction of a home on the lot. Their intention was to pay cash for the construction. Between October 24 and November 4, 1996, they paid $77,800.

Meanwhile, without telling the Goldings, on December 17, 1996, defendant obtained a line of credit in the amount of $149,600 from U.S. Bank secured by a trust deed on the Goldings's property. The loan was due December 17, 1997.

In 1997, the Goldings obtained a preliminary title report that disclosed the existence of the U.S. Bank trust deed. The Goldings, however, thought that the report was simply mistaken and made additional payments totaling $39,656 that year. On September 14, 1998, they made a final payment of $18,620. They received a warranty deed a couple of days later.

Defendant finally told the Goldings about the lien in February 1999, shortly before the corporation filed for bankruptcy. The Goldings ultimately lost their home to the bank, which foreclosed its lien on the property.

The Gemignanis suffered a similar fate. On July 15, 1997, they entered into a contract with the corporation for the purchase of a lot and the construction of a home. They paid $56,000 in cash at the time the contract was signed. The following month, defendant obtained a line of credit with U.S. Bank secured by a trust deed on the Gemignani property. Defendant said nothing to the Gemignanis about the lien. Meanwhile, the Gemignanis made additional payments totaling $94,933 in 1997. About three weeks after their final payment in 1998, the Gemignanis received from defendant a warranty deed, stating that they owned the property free and clear and that no liens existed. After receiving the deed, the Gemignanis went to the local courthouse and paid $488 in property taxes owed on their house.

Defendant finally told the Gemignanis that there was a lien on the house in February 1999, shortly before the corporation sought bankruptcy protection. They ultimately paid the bank $135,000 to keep the house.

The Goldings and the Gemignanis asserted claims against defendant for, among other things, violation of the UTPA and breach of contract. With respect to the UTPA claim, both plaintiffs alleged that defendant had violated ORS 646.608(1), which provides, in part:

"A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following:

"* * * * *

"(e)   Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that they do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have."

Plaintiffs' theory was that defendant had misrepresented that their homes were free and clear of any liens or encumbrances. With respect to the breach of contract claim, plaintiffs alleged that they had contracted with the corporation to purchase homes free and clear of liens and encumbrances and that the corporation had breached that condition by delivering to them homes that had been pledged as security for loans to U.S. Bank. Plaintiffs alleged that defendant is personally liable for the corporation's breach because defendant engaged in improper conduct in the exercise of his control over the corporation. Specifically, they alleged that they are entitled to "pierce the corporate veil" because defendant had

> "borrowed money on behalf of the corporation and pledged the Plaintiffs' property to U.S. Bank when he had sold the property and received payment for such property from Plaintiffs at a time when the company was undercapitalized and/or insolvent."

At trial, defendant moved for a directed verdict on both the UTPA and the breach of contract claims. He argued that there was no evidence of any damages to plaintiffs that resulted from any violation of the UTPA and that he cannot be personally liable on the breach of contract claim because undercapitalization or insolvency is a basis for piercing the corporate veil only if either exists at the time of incorporation. The trial court denied the motions, and a jury returned verdicts in favor of plaintiffs on both claims.

On appeal, defendant first argues that the trial court erred in denying his motion for a directed verdict on the UTPA claims. He argues that plaintiffs failed to offer any evidence that they suffered "ascertainable losses" within the meaning of the statute, which refers to losses that result from a violation of the UTPA. In this case, defendant argues, the only alleged violation of the UTPA was his delivery of warranty deeds that misrepresented the fact that there were no liens or encumbrances on plaintiffs' properties, and there is no evidence of any damages flowing from that act. According to defendant, any harm that either the Goldings or the Gemignanis suffered had already occurred or would have

occurred anyway and therefore cannot be attributed to the misrepresentations in the warranty deeds.

Both the Goldings and the Gemignanis argue that defendant's conclusion flows from an erroneous premise, namely, that the only violation of the UTPA that they established was the delivery of the warranty deeds that contained the false representations. According to plaintiffs, they established two other instances of misrepresentation actionable under the UTPA. First, they contend that their original contracts with the corporation for the construction of the houses contained a representation that the houses would be delivered to them free and· clear of liens and encumbrances and that such "promissory fraud" is a violation of ORS 646.608(1)(q). Second, they argue that the same contract with the corporation provides that final payment is not due until there has been a complete release of all liens, and that, when defendant accepted their final payment, he, in effect, committed fraud.

Defendant replies that, as to the supposed promissory fraud, whether or not it occurred or is recognized as a violation of ORS 646.608(1), the fact remains that plaintiffs did not bring these cases under that statute. As to the supposed fraud that was implicit in receiving payment under the contract, defendant replies that plaintiffs stretch the contract to mean something that it simply does not say. Defendant argues that the contract simply specifies *when* the final payment is due, *i.e.*, after complete release of all liens. It says nothing about acceptance of payments as a warranty of clear title.

■     ORS 646.638(1) provides, in part, that

> "any person who suffers any ascertainable loss of money or property, real or personal, as a result of willful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608 or 646.648, may bring an individual action in an appropriate court to recover actual damages or $200, whichever is greater."

To recover under the UTPA, therefore, the ascertainable loss must have occurred "as a result of" a defendant's violation of the statute. In this case, the only violation that plaintiffs

alleged, and the only violation on which the jury was instructed, was a violation of ORS 646.608(1)(e).

Plaintiffs' argument that the alleged promissory fraud contained in the original purchase agreement with the corporation provides an independent basis of violation of the UTPA is not well taken. To begin with, the alleged misrepresentations are contained in a contract with the corporation, not with defendant. Moreover, the misrepresentations are promissory in nature. As the Supreme Court explained in *Denson v. Ron Tonkin Gran Tourismo, Inc.*, 279 Or 85, 91 n 6, 566 P2d 1177 (1977), the UTPA separately addresses promissory fraud in ORS 646.608(1)(q), which prohibits "[p]romises to deliver real estate, goods or services within a certain period of time with intent not to deliver them as promised." No other provision of the UTPA addresses promissory fraud. *Denson*, 279 Or at 91 n 6. In this case, as we have noted, the jury was instructed only on the alleged violation of ORS 646.608(1)(e) and no other provision of the UTPA.

■ Plaintiffs' attempt to broaden the scope of defendant's fraud to include some sort of implicit fraud in accepting payments likewise is unavailing. Again, the linchpin of their argument is that the corporation—not defendant— falsely represented that they had a guarantee of clear title when it accepted their final payment. Aside from that, their argument is based on a reading of the contract that cannot be sustained by the wording. The contract with the corporation specifies *when* payment is or is not due: "Final payment shall not be due Contractor until complete release of all liens on the project are satisfied." It says nothing about any warranty of title upon receipt of the final payment.

■ We are thus left with a single violation of the UTPA: defendant's delivery of warranty deeds stating that the Goldings and the Gemignanis acquired title free and clear of liens and encumbrances. There is no debate that the delivery of those deeds violated ORS 646.608(1)(e). The only question is whether any ascertainable loss flowed from that violation.

■ The Gemignanis argue that they suffered loss as a result of the violation because they continued to pay real property taxes on the home after receiving the warranty deed

and before learning of the existence of the bank's lien. They argue that, had they known of the lien, they could have avoided at least that much loss. We agree and conclude that the trial court correctly denied defendant's motion for a directed verdict on the Gemignanis' UTPA claim.[1]

■ The Goldings' UTPA claim poses greater difficulty. The Goldings argue that they suffered loss as a result of the violation in two ways. First, they point to the fact that they ultimately lost their home. The problem is that the loss was occasioned not by any misrepresentations in the warranty deed, but by the bank's prior lien. By the time of the delivery of the deed, they already had made all the required payments. Whether the deed warranted clear title or not, they still would have lost their home to the bank. Thus, the loss of their home was not an ascertainable loss within the meaning of the UTPA. Second, the Goldings point to the fact that they incurred attorney fees in the corporation's bankruptcy proceedings. Again, however, we do not understand how the Goldings' participation in the corporation's bankruptcy proceedings was occasioned by the misrepresentations in the deed. They participated in the bankruptcy proceedings because of the existence of the bank's lien, and they would have done so whether or not the deed had warranted clear title. The Goldings identify no other loss that they incurred after the delivery of the warranty deed and before learning of the existence of the bank's lien. We therefore conclude that the trial court erred in denying defendant's motion for a directed verdict as to the Goldings' UTPA claim.

■ Defendant next argues that the trial court erred in denying his motion for a directed verdict on plaintiffs' claims for breach of the contract with the corporation. Defendant argues that the claims against him are based on a theory of

---

[1] The dissent argues that, because the Gemignanis later paid an additional $150,000 to retain possession of the home, it simply cannot be believed that, but for the misrepresentation in the warranty deed, they would not have paid the taxes. Whether the Gemignanis' contention is believable, however, is a question of fact for the jury to decide. We review for *any* evidence, not merely for evidence that, in our own view, is believable. *See, e.g., Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003) (appellate courts "review[ ] the denial of a motion for directed verdict for any evidence to support the verdict in plaintiff's favor").

piercing the corporate veil, based on either corporate insolvency or undercapitalization. According to defendant, neither condition provides a basis for piercing the corporate veil unless the corporation was insolvent or undercapitalized at the time of its formation, and there is no evidence of that in this case. Plaintiffs respond that defendant attacks a straw man. According to plaintiffs, their complaints allege that they are entitled to pierce the corporate veil, not because of insolvency or undercapitalization, but because of defendant's improper conduct in exercising control over the corporation at a time when the corporation was insolvent or undercapitalized.

■ ■     Insolvency or undercapitalization may provide a basis for securing the benefit of piercing the corporate veil. *See, e.g., Stirling-Wanner v. Pocket Novels, Inc.*, 129 Or App 337, 341, 879 P2d 210 (1994) ("gross undercapitalization of a debtor corporation by itself could suffice to hold a shareholder liable to a creditor who is unable to collect against the corporation because of inadequate capitalization"). But it is not the only basis for piercing the corporate veil. Plaintiffs also may do so if they prove that, among other things, a shareholder engaged in improper conduct in the exercise of actual control over the corporation. *Salem Tent & Awning v. Schmidt*, 79 Or App 475, 481, 719 P2d 899 (1986).

In this case, the complaints clearly allege entitlement to pierce the corporate veil based on the fact that

"defendant borrowed money on behalf of the corporation and pledged the Plaintiffs' property to U.S. Bank when he had sold the property and received payment for such property from Plaintiffs at a time when the company was undercapitalized and/or insolvent."

At trial, plaintiffs proved that defendant engaged in improper conduct by obligating the corporation to repay loans that it could not possibly pay because of its undercapitalization or insolvency, loans that were secured by plaintiffs' property. And the case went to the jury on a theory of "improper conduct," not insolvency or undercapitalization.

Thus, in arguing that plaintiffs cannot pierce the corporate veil because there is no evidence of insolvency or

undercapitalization, defendant indeed attacks a straw man. We conclude that the trial court did not err in denying defendant's motions for a directed verdict on the breach of contract claims.

Judgment on UTPA claim in A114576 reversed; otherwise affirmed.

**ARMSTRONG, J.,** concurring in part, dissenting in part.

I agree with the majority's decision except for its decision to affirm the judgment for the Gemignanis under the Unlawful Trade Practices Act (UTPA). The majority concludes that the Gemignanis suffered an ascertainable loss as a result of their receipt of the warranty deed for their property because they paid $488 in real property taxes on the property after receiving the deed.[1] It reasons that they could have avoided paying those taxes if they had received a deed that disclosed the existence of the bank lien on their property, so the payment of that money constitutes a loss. 187 Or App at 590-91

I respectfully disagree. The $488 tax payment would have constituted a loss to the Gemignanis if the bank had foreclosed its lien on their property. In that event, the $488 is money that they would not have paid if they had received a correct warranty deed and, hence, money that they would not have lost. However, the Gemignanis ultimately decided to keep their property by paying the bank $135,000 to release its lien. Their decision to do that means that they would have had to pay the $488 in taxes if they had not already paid them. Consequently, their tax payment did not constitute a loss that they suffered as a result of the misrepresentation in the warranty deed, because it was a payment that they had to make as owners of the property.

---

[1] ORS 646.638(1) provides that

· "any person who suffers any ascertainable loss of money or property, real or personal, as a result of willful use or employment by another person of a method, act or practice declared unlawful by [the UTPA], may bring an individual action in an appropriate court to recover actual damages or $200, whichever is greater."

The Gemignanis did not submit any evidence or argue that they would have let the bank foreclose its lien if they had not already made the $488 tax payment. In other words, nothing suggests that they would have abandoned their $150,000 investment in their property if they had received a correct warranty deed after making their final payment on the property, so, again, there is no basis on which to find that the Gemignanis suffered an ascertainable loss by making the tax payment. Consequently, the trial court erred by denying defendant's motion for a directed verdict on the Gemignanis UTPA claim.