FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HAMBLETON BROTHERS LUMBER CO.,
a Washington corporation,
          *Plaintiff-Appellant,*

          v.

BALKIN ENTERPRISES, INC., an
Oregon corporation; JIM
BALLINGER, an individual; DALE
KINSEY; FINANCIAL INVESTMENTS,
INC., an Oregon corporation;
WILLIAM ABRACZINSKAS, an
individual; KERRYLEE HARRINGTON-
ADRACZINS, an individual; MARITAL
COMMUNITY OF WILLIAM AND
KERRYLEE ABRACZINSKAS,
          *Defendants-Appellees.*

No. 03-35480

D.C. No.
CV-00-01765-
GMK/DJH

OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted
September 15, 2004—Portland, Oregon

Filed February 11, 2005

Before: J. Clifford Wallace, Ronald M. Gould, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Gould

## COUNSEL

Kurt M. Rylander, P.C., Vancouver, Washington, for the plaintiff-appellant.

Mark B. Comstock, Garrett, Hemann, Robertson, Jennings, Comstock & Trethewy, P.C., Salem, Oregon, for the defendant-appellee.

**OPINION**

GOULD, Circuit Judge:

We must decide whether a Washington timber company's claims arising from the alleged breach of a timber contract were properly dismissed on summary judgment.

Hambleton Brothers Lumber Company appeals the district court's grant of summary judgment to Jim Ballinger on Hambleton Brothers's claims of breach of contract, piercing of the corporate veil, fraudulent concealment, unfair and deceptive trade practices under the Washington Consumer Protection Act, and shareholder distributions recoverable pursuant to Oregon Revised Statute section 60.645. Ballinger was formerly the president of Balkin Enterprises, an Oregon corporation that had entered into a contract with Hambleton Brothers in 1994 giving Hambleton Brothers the right to all merchantable timber on a particular parcel of land for a period of just over three years. Before Hambleton Brothers could log the property, it was sold by one William Abraczinskas, an unauthorized individual purporting to be Balkin's agent, and then logged by another company. Hambleton Brothers, gaining nothing for the funds it had paid for the logging rights, brought suit naming all parties involved both in the timber contract and in the property transfer, and the district court granted summary judgment as to defendant Ballinger on all claims. The court also granted Ballinger's motions to strike two documents offered by Hambleton Brothers. Accordingly, we must also decide whether either of those decisions was an abuse of the district court's discretion. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part, and reverse in part and remand.

**I**

Hambleton Brothers is a family-owned and operated Washington timber company founded in the 1950s. James Hamble-

ton has thirty-years experience in the timber industry and has overseen the company's timber purchases since 1991. Balkin Enterprises was an Oregon corporation that engaged in real estate, timber, and racehorse transactions. Jim Ballinger and Dale Kinsey incorporated Balkin Enterprises in 1992, with each as a fifty-percent shareholder and Ballinger as Balkin's president.

On January 24, 1994, Hambleton Brothers and Balkin entered into a Timber Sales Agreement giving Hambleton Brothers the timber rights to a forty-acre plot in eastern Washington ("Fruitland property") until January 31, 1997, for $170,000. Before purchasing the timber rights and in lieu of hiring a "timber cruiser" to survey the land, Hambleton Brothers employed Chuck Adams to appraise the Fruitland timber by relying on a previously completed timber cruise.[1] Hambleton Brothers employed Adams to appraise land for timber value five to ten times between 1993-1995. Adams also worked for Balkin occasionally as a timber cruiser; Balkin paid him a finder's fee for his services. Adams introduced Kinsey and Ballinger to James Hambleton. Hambleton Brothers's decision to enter into the timber contract was based in part on Adams's appraisal of the timber value and in part on discussions with Dale Kinsey, but not on any discussion with Ballinger. Hambleton Brothers did not know at the time of the contract formation that Balkin Enterprises was also paying Adams a fee for his services.

In late 1994, Ballinger told Kinsey he wanted to end his participation in Balkin, and Ballinger returned to his former employment. Kinsey assumed control of all Balkin's assets, including its office equipment, horses, and title to the Fruit-

---

[1] A "timber cruise" is "a statistical analysis of the volume of timber on a tract, which is obtained by taking plot samples at various intervals and extrapolating total volumes from those samples." Victor P. Haley, *Seeing the Forest and the Trees: Buying and Selling Timberland*, Prob. and Prop., Sept./Oct. 1998, at 18, 19.

land property. However, neither man took steps formally to dissolve Balkin Enterprises. On July 25, 1995, Ballinger paid Kinsey $18,469 to cover half of Balkin's remaining expenses. Balkin Enterprises was administratively dissolved on September 21, 1995, for failing to renew its corporate status with the Office of the Secretary of State of Oregon.

On July 5, 1995, William Abraczinskas signed an unrecorded warranty deed transferring the Fruitland real estate from Balkin to Financial Investments, Inc. for ten dollars. Although Abraczinskas signed the deed purporting to be Balkin's vice president, he was not an employee, officer, or shareholder of Balkin. Ballinger and Kinsey knew Abraczinskas and had conducted business with him on a prior occasion, but neither authorized him to engage in any transaction on behalf of Balkin Enterprises. Financial Investments was Abraczinskas's own company. After several other rapid property transactions,[2] Cascade Pacific Land & Timber bought a timber deed to the Fruitland real estate and logged the property.

With no timber for its $170,000, Hambleton Brothers filed suit in the United States District Court for the District of Oregon on December 22, 2000, bringing claims for breach of the Timber Sales Agreement, interference with economic relations,[3] fraud and concealment, unfair and unlawful trade practices under the Washington Consumer Protection Act (WCPA), piercing the corporate veil, and shareholder distributions recoverable pursuant to Or. Rev. Stat. § 60.645. Ballinger was

---

[2]On July 7, 1995, Financial Investments deeded the Fruitland property to Sherry Miles for $129,000, for which Miles signed a promissory note. Financial Investments sold the note to Great Northwest Investments on July 12, 1995. Miles deeded the property to MGM Development, Inc. on February 16, 1996. On August 1, 1996, MGM Development granted a timber deed for all timber on the Fruitland property to Cascade Pacific Land & Timber for $32,000.

[3]Hambleton Brothers's complaint was later amended to drop the claim for interference with economic relations as to defendant Ballinger.

named as a defendant, along with Balkin Enterprises, Kinsey, Mr. and Mrs. Abraczinskas, Financial Investments, and Trevor Coxen, the president of Financial Investments. On October 24, 2001, the district court granted Hambleton Brothers's motion for entry of default against Balkin and Financial Investments. On January 10, 2002, Ballinger individually moved for summary judgment on all claims.

On February 1, 2002, after the summary judgment motion was filed, Hambleton Brothers submitted corrections to the deposition of James Hambleton. The corrections expanded upon and rewrote portions of James Hambleton's deposition testimony, including for the first time new accusations implicating defendant Ballinger. On May 17, 2002, Hambleton Brothers submitted a declaration from Dale Kinsey. Ballinger moved to strike both documents.

In his Findings and Recommendations the magistrate judge recommended that Ballinger's motions to strike be granted, and that Ballinger be granted summary judgment on all claims. The district court adopted the proposed findings in their entirety and entered final judgment in favor of Ballinger pursuant to Federal Rule of Civil Procedure ("FRCP") 54(b). This appeal followed.

## II

We first address the district court's order granting Ballinger's motions to strike the James Hambleton deposition corrections and the Dale Kinsey declaration, respectively.[4]

---

[4]A district court's grant of a motion to strike is reviewed for an abuse of discretion. *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003); *see also Maldonado v. U.S. Bank*, 186 F.3d 759, 768-69 (7th Cir. 1999).

### A

**[1]** Federal Rule of Civil Procedure 30(e) states:

> If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed by subdivision (f)(1) whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed.

FRCP 30(e).[5] James Hambleton's deposition corrections were signed and notarized on February 1, 2002. Hambleton Brothers argues that the corrections were timely under FRCP 30(e), because it did not actually receive the deposition transcript until January 7, 2002. This argument is unavailing. FRCP 30(e) states that the thirty-day correction clock begins upon notification of availability, not possession. *Id.* The court reporter's affidavit states that Hambleton Brothers was notified of the deposition transcript's availability for review at the latest on December 31, 2001. The corrections were thus properly due no later than January 30, 2002. *See Blackthorne v. Posner*, 883 F. Supp. 1443, 1454 n.16 (D. Or. 1995) (excluding untimely deposition corrections); *Workman v. Chinchinian*, 807 F. Supp. 634, 644-45 (E.D. Wash. 1992) (same); *see also Rios v. Bigler*, 67 F.3d 1543, 1552-53 (10th Cir. 1995) (excluding corrections in part because the record

---

[5]A district court's interpretation of the Federal Rules of Civil Procedure is reviewed de novo. *United States v. 2,164 Watches, More or Less Bearing a Registered Trademark of Guess?, Inc.*, 366 F.3d 767, 770 (9th Cir. 2004). Our interpretation of FRCP 30(e) is an issue of first impression.

did not show the plaintiff's corrections were submitted within the "mandatory thirty day period").

**[2]** Missing the thirty day deadline by a mere day or two might not alone justify excluding the corrections in every case. However, Hambleton Brothers compounded its mistake with other violations of FRCP 30(e). First, Hambleton Brothers omitted any statement in the deposition errata explaining the corrections, despite the fact that the plain language of the Rule requires that a statement giving reasons for the corrections be included. Hambleton Brothers offers no argument to explain its omission.

**[3]** A statement of reasons explaining corrections is an important component of errata submitted pursuant to FRCP 30(e), because the statement permits an assessment concerning whether the alterations have a legitimate purpose. The magistrate judge was troubled by the deposition corrections' seemingly tactical timing—the corrections were submitted only after Ballinger's motion for summary judgment was filed —and by their extensive nature. The absence of any stated reasons for the changes supports the magistrate judge's concern that the "corrections" were not corrections at all, but rather purposeful rewrites tailored to manufacture an issue of material fact regarding Ballinger and to avoid a summary judgment ruling in his favor.[6] Under our "sham" affidavit

---

[6]Several of the twenty-seven James Hambleton deposition corrections are clearly altered to allege facts sufficient to connect Ballinger where none before existed. For example:

Q: What term of the Timber Sales Agreement did Mr. Ballinger breach?

A: Personally, I guess he, he didn't breach it.

*Submitted corrected A: I don't know the law but if Mr. Ballinger is responsible for Balkin's actions, then if Balkin breached the agreement, Mr. Ballinger breached the agreement.*

Q: What utterances did Mr. Ballinger provide to you that you allege deceived you? . . .

rule, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). We think this type of "sham" correction is akin to a "sham" affidavit. While the language of FRCP 30(e) permits corrections "in form or substance," this permission does not properly include changes offered solely to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment. *Cf. Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488-89 (9th Cir. 1991) (dismissing with prejudice and granting Rule 11 sanctions against a party and its counsel because the attorney, in an effort to avoid summary judgment, made substantive changes to the party's deposition testimony in violation of FRCP 30(e)). The Tenth and Seventh Circuits have interpreted FRCP 30(e) similarly. *See, e.g.*, *Burns v. Bd. of County Comm'rs*, 330 F.3d 1275, 1281-82 (10th Cir. 2003) ("We see no reason to treat Rule 30(e) corrections differently than affidavits, and we hold that Burns's attempt to amend his deposition testimony must be evaluated under [the sham affidavit doctrine]."); *accord Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002) (" 'The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful

---

A: I don't know.

*Submitted corrected A: Mr. Ballinger represented to me in 1996 or 1997 that Balkin still owned the Fruitland property. He acted as if he was still involved with Balkin.*

Q: Specifically what conduct did Mr. Ballinger take that improperly dissolved Balkin Enterprises?

A: I don't know.

*Submitted corrected A: Ballinger in the dissolution of Balkin distributed assets of Balkin, the Fruitland property, that should not have been distributed, and he made me believe, in the 1996/1997 telephone conversation, that Balkin was still in existence and still owned the Fruitland property, which was untrue.*

responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.' ") (quoting *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992)); *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) ("We also believe, by analogy to the cases which hold that a subsequent affidavit may not be used to contradict the witness's deposition, that a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.' ") (citations omitted). We agree with our sister circuits' interpretation of FRCP 30(e) on this point, and hold that Rule 30(e) is to be used for corrective, and not contradictory, changes.

Finally, FRCP 30(e) also requires the deponent or the interested party to request review of the deposition in order to make corrections. The parties dispute whether Hambleton Brothers asked to review the transcript for corrections, but no such request was recorded at the James Hambleton deposition, nor was it indicated on the deposition certificate of the officer, as required by FRCP 30(e) and 30(f)(1).[7] *See Blackthorne*, 883 F. Supp. at 1454 n.16; *see also Rios*, 67 F.3d at 1552 (noting that the plaintiff failed to provide the certificate indicating the party requested review of the deposition and holding that requesting review is an "absolute prerequisite" for correcting a deposition under FRCP 30(e)).

**[4]** We hold that the district court did not abuse its discretion in striking the deposition errata because Hambleton Brothers failed to comply with the procedural dictates of FRCP 30(e).

---

[7]The magistrate judge made no finding as to whether a request to review the deposition was properly made, concluding it was unnecessary to decide the issue because the other procedural problems with the corrections presented sufficient grounds on which to grant the motion to strike.

**B**

**[5]** Hambleton Brothers also appeals the district court's order granting Ballinger's motion to strike the Dale Kinsey declaration. Some procedural time frame is helpful: Ballinger moved for summary judgment on January 10, 2002. The magistrate judge ordered that Hambleton Brothers's summary judgment response, and all documents in support of that response, be submitted by April 1, 2002. Oral argument was held on May 9, 2002 on both the summary judgment and the motion to strike the James Hambleton corrections. The parties were granted leave by the magistrate judge to submit further supplemental briefing on the latter issue only. Hambleton Brothers then submitted the Kinsey declaration on May 17, 2002, which consisted of further evidence for summary judgment, but submitted no information regarding the timeliness or conformity of the James Hambleton deposition corrections. Because the deadline for the summary judgment opposition lapsed forty-seven days earlier, the Kinsey declaration was untimely. We hold that the district court did not abuse its discretion in striking the Kinsey declaration as untimely. *See* D. Or. L.R. 7.1(g)(3) (stating that no additional briefing is permitted without the permission of the court); *cf. Leong v. Potter*, 347 F.3d 1117, 1125 (9th Cir. 2003) (holding that it is not an abuse of discretion to enforce court's procedural rules by striking a "request for an adverse inference because it was made in a supplemental brief that was over-length and filed late").

**III**

We now turn to Hambleton Brothers's claims dismissed on summary judgment.[8] We address each in turn, beginning with the breach of contract claim.

---

[8]A district court's grant of summary judgment is reviewed de novo. *See United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). Summary judgment is appropriate "if the pleadings, depositions, answers to

## A

Hambleton Brothers acknowledges that Jim Ballinger was not a party to the timber contract, and does not allege that Ballinger personally breached that contract. Instead, Hambleton Brothers's breach of contract claim is that Ballinger should be held liable for Balkin's breach because Ballinger is the administratively dissolved Balkin's "successor" and the timber agreement included a provision binding all "successors and assigns of Seller and Buyer."

**[6]** Hambleton Brothers provides no authoritative citation to support its legal contention that Ballinger is the successor of Balkin, nor does Hambleton Brothers explain why a successor (and not Balkin itself) should be liable for the contract breach. Instead, Hambleton Brothers leaps to the conclusion that Ballinger must be Balkin's successor because Balkin was administratively dissolved. Balkin's liabilities do not automatically transfer to a "successor" simply because of dissolution. Oregon law[9] on corporate dissolution does not include a provision making shareholders the successors of a dissolved corporation, or divesting the corporation of its assets or liabilities. *See* Or. Rev. Stat. § 60.637(2) ("Dissolution of a corporation does not: (a) Transfer title to the corporation's

---

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Viewing the facts in the light most favorable to the nonmoving party, we must determine whether a genuine issue of material fact exists, and whether the district court applied the law correctly. *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004). "A '*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).

[9]Balkin Enterprises was an Oregon corporation.

property [or] . . . (e) Prevent commencement of a proceeding by or against the corporation in its corporate name"). Rather, an administratively dissolved corporation continues its corporate existence for the purposes of "wind[ing] up . . . its business and affairs." *Id.* § 60.651(3). Such matters include "[d]ischarging or making provision for discharging its liabilities" and "[d]oing every other act necessary to wind up and liquidate its business and affairs." *Id.* § 60.637(1)(c), (e). Addressing an alleged contract breach and any accompanying liability is included in the ambit of Balkin's wind up of its affairs. We affirm the district court summary judgment dismissal on Hambleton Brothers's breach of contract claim.

**B**

We turn to Hambleton Brothers's claim that Balkin's corporate veil should be pierced to reach Ballinger. The doctrine of limited liability is a basic and fundamental rule of corporate law, and it has served society well by encouraging corporate enterprise without risk of personal liability for the corporation's debts. *See, e.g.*, *Anderson v. Abbott*, 321 U.S. 349, 362 (1944) ("Limited liability is the rule not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted."). Shareholder protection through the corporate form is "ingrained in our economic and legal systems" and, indeed, "no one would claim that the availability of limited liability [has] played an insignificant part in the expansion of industry and in the growth of trade and commerce." *See* (then-Professor) William O. Douglas & Carrol M. Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193, 193 (1929).

We note at the outset that in this diversity case we must apply Oregon law to the piercing the corporate veil claim, and that in Oregon, as elsewhere, generally corporate shareholders are not responsible for the debts of a corporation beyond their capital contributions. *See* Or. Rev. Stat. § 60.151. In accor-

dance with the well-settled social and economic policy behind limited liability that Justice Douglas describes above, in Oregon piercing the corporate veil "is an extraordinary remedy which exists as a last resort, where there is no other adequate and available remedy to repair the plaintiff's injury." *Amfac Foods, Inc. v. Int'l Systems & Controls Corp.*, 654 P.2d 1092, 1098 (Or. 1982) (en banc). Oregon courts have been "extremely reluctant to disregard the corporate form unless exceptional circumstances exist." *City of Salem v. H.S.B.*, 733 P.2d 890, 894 (Or. 1987) (en banc). Under Oregon law, then, we may hold facts sufficient to pierce the corporate veil only in exceptional circumstances.

[7] Oregon courts require three elements to pierce the limited liability veil and impose corporate liability on a shareholder:

> (1)   The shareholder must have controlled the corporation; (2) the shareholder must have engaged in improper conduct in his exercise of control over the corporation; and (3) the shareholder's improper conduct must have caused plaintiff's inability to obtain an adequate remedy from the corporation.

*Rice v. Oriental Fireworks Co.*, 707 P.2d 1250, 1255 (Or. Ct. App. 1985); *see also Amfac*, 654 P.2d at 1101-02.

[8] A genuine issue of material fact exists regarding the first element: It is unclear if Ballinger had control of Balkin during the time when Hambleton Brothers alleges improper conduct occurred. Ballinger arguably did have control of Balkin until the end of 1994. At that time Ballinger alleges that he relinquished control of Balkin entirely to Kinsey, despite the fact that neither man took any official steps to dissolve Balkin, or record Ballinger's resignation in any formal manner. Moreover, James Hambleton also testified that Ballinger spoke with him on the phone in 1996 or 1997 about the

Fruitland property and never mentioned that he had ceased control over Balkin.

Shareholder control is necessary, but not alone sufficient to pierce the corporate veil. *Amfac*, 654 P.2d at 1100-01. Even if the first element of shareholder control is met, to proceed to trial Hambleton Brothers must still demonstrate that there is a genuine issue of material fact regarding the remaining two elements: that Ballinger engaged in "improper conduct" while in control of Balkin and that Ballinger's "improper conduct" caused Hambleton Brothers's inability to obtain an adequate remedy from Balkin. *Id.* at 1101. "Improper conduct" can include gross undercapitalization, milking or draining of corporate funds, misrepresentation, commingling of funds, holding out, and the failure to observe corporate formalities. *Id.* at 1102-03; *Salem Tent & Awning Co. v. Schmidt*, 719 P.2d 899, 903 (Or. Ct. App. 1986). Even if improper conduct of a shareholder is shown, a "causal connection" must be shown: The plaintiff must "demonstrate a relationship between the misconduct and the plaintiff's injury." *Amfac*, 654 P.2d at 1103.

Hambleton Brothers's alleges that Ballinger engaged in three types of "improper conduct": 1) the sale of the Fruitland property and subsequent breach of the timber contract; 2) the "gross undercapitalization" of Balkin; and 3) the improper "milking" or draining of corporate funds. We address each in turn.[10]

---

[10]Oregon courts have declined to decide whether all allegations of improper conduct should be analyzed together or as separate and independently sufficient bases for imposing shareholder liability. *Or. Pub. Employees' Ret. Bd. ex. rel. Or. Pub. Employees' Ret. Fund v. Simat, Helliesen & Eichner*, 83 P.3d 350, 363 n.17, 367 (Or. Ct. App. 2004) (examining improper conduct allegations separately and holding that improper "milking" was a sufficient basis upon which to pierce the veil).

### 1

Hambleton Brothers's first "improper conduct" allegation is that Ballinger was in cahoots with Abraczinskas. Hambleton Brothers contends: 1) that Ballinger was the "prime mover" in the Fruitland Timber Agreement; and 2) that Ballinger "knew and assisted" in the fraudulent sale of the Fruitland property by Abraczinskas.

[9] The record does not support Hambleton Brothers's allegations. First, there is no evidence Ballinger was the "prime mover" in the Fruitland timber contract negotiations. While Ballinger interacted with James Hambleton on past deals, the two men did not speak regarding the timber contract except, according to Hambleton Brothers, during one telephone conversation after the contract breach. James Hambleton acknowledged that he did not rely on any representation by Ballinger in entering the timber agreement with Balkin. And, while Hambleton Brothers offers evidence that Ballinger and Abraczinskas had associated in the past, there is nothing in the record to refute Ballinger's deposition testimony that he did not know of Abraczinskas's unauthorized representation of Balkin and the transfer of the Fruitland property. Hambleton Brothers's conjecture of Ballinger's possible involvement with Abraczinkskas is insufficient to create a genuine issue of material fact regarding this type of "improper conduct."

### 2

"Improper conduct" sufficient to pierce the corporate veil can also include the "gross undercapitalization" of a corporation. *Amfac Foods*, 654 P.2d at 1101; *Stirling-Wanner v. Pocket Novels, Inc.*, 879 P.2d 210, 213 (Or. Ct. App. 1994). Hambleton Brothers argues that Ballinger's initial capitalization of Balkin Enterprises with only $2,500, when compared to the later Fruitland timber contract with Hambleton Brothers for $170,000 worth of timber, was gross undercapitalization.

**[10]** Oregon courts have elaborated on "gross undercapitalization," emphasizing that "a corporation must have sufficient capital to cover its *reasonably anticipated liabilities*, measured by the nature and magnitude of its undertaking, the risks attendant to the particular enterprise and *normal operating costs* associated with its business." *Gardner v. First Escrow Corp.*, 696 P.2d 1172, 1177-78 (Or. Ct. App. 1985) (emphases added); *see also Rice*, 707 P.2d at 1256 ("A corporation is inadequately capitalized when its assets are insufficient to cover its potential liabilities, which are *reasonably foreseeable* from the nature of the corporation's business.") (emphasis added). Abraczinskas's unauthorized fraudulent sale of the Fruitland timber was not a "reasonably foreseeable" liability, nor a risk associated with the "normal operating costs" of business.

Hambleton Brothers relies upon *Vuylsteke v. Broan*, 17 P.3d 1072, 1074 (Or. Ct. App. 2001), in which the Oregon Court of Appeals held a corporation's sole shareholder liable for the corporation's default on an employment contract because the corporation was inadequately capitalized and disregarded corporate formalities. *Vuylsteke* is inapposite: In that case, the capitalization of the corporation had failed adequately to cover the foreseeable employment salary and projected annual costs of the defendant corporation. *Id.* In sharp contrast, there is no showing that when Ballinger and Kinsey formed Balkin Enterprises, they did so without due regard for projected internal costs. Instead, the loss to Balkin caused by Abraczinskas, with his complex and covert scheme of fraudulent land transfers, cannot be viewed as reasonably foreseeable by the incorporators of Balkin. This unexpected liability stemming from a fraud is not at all akin to a liability for projected internal costs that were not adequately covered by capitalization. Moreover, unlike in *Vuylsteke*, the record shows that Ballinger and Kinsey did not disregard statutorily required corporate formalities. For these reasons, *Vuylsteke* does not control this case and our application of Oregon law.

**[11]** Hambleton Brothers also points to Balkin's default as evidence of its undercapitalization. While Balkin was devoid of any funds when administratively dissolved, "the fact[ ] that the defendant corporation[ ] [is] now out of business and cannot pay plaintiff's judgment [is] not a sufficient basis on which to conclude that [it was] undercapitalized." *Aero Planning Int'l., Inc. v. Air Assocs., Inc.*, 764 P.2d 610, 612 (Or. Ct. App. 1988). The mere fact that the two entrepreneurs began their corporation with a small amount of capital is, without more, insufficient to justify the "extraordinary remedy" of piercing the veil. *Amfac*, 654 P.2d at 1098.

## 3

**[12]** "Improper conduct" sufficient to pierce the corporate veil can include the improper "milking" of a corporation. *Id.* at 1102.[11] With regard to "milking" as an example of improper conduct, the *Amfac* court stated: "*Milking*: Shareholders have been held liable for a corporation's debt because they have milked a corporation by payment of excessive dividends, by the sale of products to the shareholders at a reduced price, or by exacting unreasonable management charges." *Id.* (internal citations to other states' law and federal bankruptcy law omitted). Hambleton Brothers alleges that Ballinger improperly drained Balkin's assets by making distributions,

---

[11]"Milking" has been defined as: "To deprive or defraud (a person, etc.) (from, of money, etc.), esp. by taking regular amounts over a period of time; to exploit, turn into a source of (freq. illicit) profit, advantage, information, etc.; to extract all possible advantage from." IX Oxford English Dictionary 772 (2d ed. 2001). A similar concept is the "siphoning" or "draining" of corporate assets, which are considered in some jurisdictions to justify piercing the corporate veil under either state or federal law. *See, e.g.*, *Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194-99 (3d Cir. 2003); *Birbara v. Locke*, 99 F.3d 1233, 1240 n.7 (1st Cir. 1996); *Minn. Power v. Armco, Inc.*, 937 F.2d 1363, 1367 (8th Cir. 1991); *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1293-94 (5th Cir. 1988); *Wegerer v. First Commodity Corp. of Boston*, 744 F.2d 719, 729 (10th Cir. 1984); *Edwards Co. v. Monogram Indus., Inc.*, 700 F.2d 994, 998 (5th Cir. 1983).

loans, racehorse purchases, and payments to Adams. Ballinger counters by pointing to $18,469 he paid Kinsey on July 28, 1995, allegedly to pay his share of Balkin's wind-up costs.

**[13]** Hambleton Brothers offers no specific facts in support of its general "milking" assertions. There is nothing in the record indicating that any racehorse purchases or payments to Adams were improper milking, or indicating a general course of improper distributions or loans to any insiders, including Ballinger.

**[14]** However, the record includes several 1995 documents obtained from Balkin's accountant purporting to show distributions and/or loans from Balkin to Ballinger before or during the spring of 1995.[12] We construe Hambleton Brothers's argument to be that these documents are evidence of Ballinger "milking" of "excessive dividends" from Balkin.[13] Even when this evidence is viewed in the best light for Hambleton Brothers, as we must view it in this summary judgment context, the Balkin accounting documents, alone and with nothing more, are an insufficient basis upon which to pierce the corporate veil, because the quantity and character of the entries are not sufficient to meet a traditional definition of "milking" of a corporation.[14]

---

[12]Hambleton Brothers alleges that these documents show a $15,513 draw to Ballinger, entries of $10,232.18 and $11,440.33 in Ballinger's "AAA" account, distributions of $15,513 and $4,072.97, and a loan to Ballinger from Balkin of $15,513. The first document is dated for the "period ending 01/31/95." The others are dated "as of 5/31/95," "1/1/95-05/31/95," or simply "5/31/95."

[13]The is no evidence of the other two examples of "milking" noted by the *Amfac* court—the sale of products to shareholders at a reduced price and the exacting of unreasonable management charges. *See* 654 P.2d at 1102.

[14]Piercing a corporate veil based on "milking" of "excessive dividends" makes sense in cases of corporate manipulation where corporate assets are systematically and extensively removed from the corporation. *See, e.g.,* Stephen B. Presser, Piercing the Corporate Veil § 1:8, at 1-49 (2004)

Moreover, these alleged 1995 distributions did not cause Balkin's default on the timber contract with Hambleton Brothers; Abraczinskas's fraudulent scheme of land transfers did. *See Amfac*, 654 P.2d at 1103 (holding that, to show a "causal connection," the plaintiff must "demonstrate a relationship between the misconduct and the plaintiff's injury"). The documents pre-date Abraczinskas's unauthorized July 5, 1995 sale of the Fruitland property and thus Balkin's subsequent contract breach. In fact, at the time of the alleged "milking," Balkin had no outstanding debts, to Hambleton Brothers or to anyone else. *Cf.* Stephen B. Presser, Piercing the Corporate Veil, § 1:8, at 1-49 n.10 (2004) (describing the "classic" milking situation as one where a shareholder "transfers funds or resources to himself at a time when debts are outstanding to outsider creditors"). Hambleton Brothers does not argue otherwise; it notes only that, but for these alleged 1994-1995 dividends to Ballinger, Balkin would have at least some capital with which to pay a part of its debt. This in and of itself is insufficient to show the necessary "causal connection" between the alleged "milking" of distributions and Hambleton Brothers's injury. *Id.* at 1103.

---

(describing "milking cases" as cases "where shareholders *systematically* withdraw capital from their corporations without regard to the needs of the business") (emphasis added). For example, the case cited in *Amfac* to represent this type of "milking" concerned over nine million dollars in dividends "milked" over the course of two years. 654 P.2d at 1102 (citing *Burton v. Roos*, 20 F. Supp. 75 (W.D. Tex. 1937), *aff'd sub nom. Texas Co. v. Roos*, 93 F.2d 380 (5th Cir. 1937)). Similarly, the only case in which an Oregon court has pierced the veil based on the improper conduct of "milking" concerned the "milking" of two million dollars in corporate assets, which materially affected the corporation's prospect of attracting ten million dollars in investment, and consequently caused the corporation to default on a contractual obligation. *Or. Pub. Employees' Ret. Bd. ex. rel. Or. Pub. Employees' Ret. Fund*, 83 P.2d at 365-67. The modest number of alleged distributions or loans challenged as "milking" in this case, even if these are assumed to be wrongful and not merely an accounting reclassification of past shareholder loans to Ballinger, are not of a sufficient amount or frequency to be considered a "milking" of the corporation.

**[15]** Finally, even if the accounting documents were sufficient evidence of "milking" and Hambleton Brothers could satisfy the causation element required to create a genuine issue of material fact, Hambleton Brothers has another statutory remedy available, and one entirely congruent with the alleged wrong. The adequate statutory remedy is reflected in Hambleton Brothers's claim under Or. Rev. Stat. § 60.645, which allows for the enforcement of the default judgment that Hambleton Brothers obtained against Balkin by potentially recouping any shareholder distributions made to Ballinger during liquidation. *See* Section III.C. *infra*.[15] The Oregon courts explicitly have held that the "extraordinary remedy" of piercing the corporate veil is only to be granted as "a last resort, *where there is no other adequate and available remedy to repair the plaintiff's injury.*" *Amfac*, 654 P.2d at 1098 (emphasis added).[16] In this case, as we discuss further below, there is another available remedy under which Hambleton Brothers may recover the alleged dividends to Ballinger.

## 4

**[16]** In sum, we hold that Hambleton Brothers has not shown a genuine issue of material fact on the element of improper conduct by shareholders. Hambleton Brothers has also failed to show a fact issue on the element that improper conduct of shareholders caused the injury for which Hambleton Brothers seeks to establish shareholder Ballinger's liability for Balkin's corporate debt. We affirm the district court's summary judgment defeating Hambleton Brothers's attempt to pierce the corporate veil.

---

[15]As we discuss in more detail in Section III.C below, the 1995 accounting documents are sufficient to raise a genuine issue of material fact on Hambleton Brothers's claim under Or. Rev. Stat. § 60.645.

[16]Specifically with regard to "milking" as a form of possible improper conduct, the *Amfac* court advised that: "Insofar as milking is concerned, in many instances readily effective independent theories of recovery may exist, such as a creditor's bill, a derivative suit, or a direct claim against directors." 654 P.2d at 1102 n. 16.

## C

**[17]** We next address Hambleton Brothers's claim under Or. Rev. Stat. § 60.645. That statutory section provides that "[a] claim against a dissolved corporation . . . may be enforced: . . . (2) if the assets have been distributed in liquidation, against the shareholder of the dissolved corporation to the extent of the shareholder's pro rata share of the claim or the corporate assets distributed to the shareholder in liquidation, whichever is less." Even if a corporation is administratively dissolved, it may liquidate assets. *Id.* § 60.637(1) ("A dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs . . . ."). Under section 60.645(2), if Ballinger, a Balkin shareholder, received any distributions from Balkin in liquidation, then Hambleton Brothers could potentially enforce the default judgment it obtained against Balkin by recouping all or part of those distributions from Ballinger.

Hambleton Brothers argues that it should be entitled to collect from Ballinger more than $25,000 pursuant to Or. Rev. Stat. § 60.645, relying on the aforementioned 1995 accounting documents purporting to show distributions and loans from Balkin to Ballinger. The record contains no accompanying testimony or financial statement explaining these documents.[17] The magistrate judge failed to address these accounting documents, even though they were properly filed,

---

[17]The first document is entitled "Balkin Enterprises, Inc. Summary Trial Balance Period Ending 01/31/95." It includes two entries listing Ballinger for a "draw" of $15,513.08 and another for an "AAA" account of J. Ballinger at $10,323.18. The second document is entitled "Balkin Ent. AJE's SYE 05/31/95." One entry appears to say "Distributions-Ballinger" and lists $15,513.00. The third document is entitled "Balkin Enterprises, Inc. Balance Sheet AS OF 05/31/95." Under the heading "EQUITY" is an entry for $11,440.03- in the "AAA" account of J. Ballinger. The last document is entitled "Federal Statements Balkin Enterprises, Inc." Under the heading "Loans to Shareholders-J. Ballinger" is listed $15,513.

relied upon in Hambleton's motion opposing summary judgment, and specifically discussed at summary judgment oral argument. Ballinger testified that, after he left Balkin in late 1994 he did not receive any benefits or assets from the company. He also paid Kinsey $18,469 to cover half of Balkin's remaining wind-up expenses in July 1995.

**[18]** The dispositive question is whether these accounting documents—viewed in the light most favorable to Hambleton Brothers—are of sufficient caliber to raise a genuine issue of material fact concerning whether Ballinger actually received any distributions from Balkin after 1994. In oral argument Ballinger's counsel argued that these documents were accounting reclassifications of an earlier loan from Balkin to Ballinger, that the reclassifications were made during wind up of the corporation, and that these entries do not reflect actual distributions during dissolution. However, the record contains no evidence that supports these assertions other than Ballinger's general testimony that he left Balkin in late 1994 and did not subsequently receive any profits from the corporation. If indeed Ballinger departed as he stated in his sworn testimony, then it may be possible that the accounting records of the 1995 distributions to Ballinger were required by generally accepted accounting principles, or otherwise were desirable, to reclassify prior unpaid insider loans to Ballinger made before he departed. However, the record before us is blank on that issue, and is not developed with any fact sufficient to permit a non-speculative determination by us. We hold that the 1995 accounting documents on their face showing distributions to Ballinger are sufficient to create a genuine issue of material fact as to whether Ballinger received distributions from Balkin in liquidation, which Hambleton Brothers potentially could recoup pursuant to Or. Rev. Stat. § 60.645(2). We reverse and remand as to this claim on this limited issue; the district court may hold such hearings as are appropriate to determine the reasons for the 1995 entries in Balkin's books showing distributions to Ballinger, and thereafter apply Oregon law to the facts as so determined.

## D

We next turn to Hambleton Brothers's fraudulent conceal-ment claim.[18] Hambleton argues that Ballinger failed to dis-close: (1) that Balkin was paying Adams a percentage of the timber estimate price "under the table;" (2) in the 1996/1997 phone conversation, that he had left Balkin or no longer repre-sented Balkin; and (3) Abracinzkas's sale of the Fruitland property.

A fraud claim under Washington law[19] must include nine elements:

> (1) A representation of an existing fact; (2) its mate-riality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; and (9) his consequent damage.

*Kirkham v. Smith*, 23 P.3d 10, 13 (Wash. Ct. App. 2001); *see also Hilton v. Mumaw*, 522 F.2d 588, 597 (9th Cir. 1975). Hambleton Brothers proffers no evidence that would meet the materiality, knowledge, intent, and reliance elements of a

---

[18]Hambleton Brothers argued below that Ballinger committed both fraudulent nondisclosure and fraudulent misrepresentation. The district court correctly concluded that any claim of affirmative misrepresentation by Ballinger was without any basis in the record: Hambleton could not have relied on any statement (false or otherwise) by Ballinger when enter-ing into the timber agreement because Ballinger and James Hambleton did not discuss the contract until at least two years later. Hambleton Brothers does not press this affirmative misrepresentation argument on appeal, instead framing its argument solely in terms of nondisclosure or conceal-ment by Ballinger.

[19]The parties agree that Washington law applies to the fraudulent con-cealment claim.

fraud claim necessary to withstand summary judgment. First, regarding Balkin's payment of Adams, we fail to see the payment's relevance with regard to the damages at issue in this case, which stem from the unauthorized sale of the Fruitland property. If Hambleton Brothers sought damages for Balkin's misrepresentation of the Fruitland timber's worth in the initial contract negotiations, the role of Adams would be of great import. However, there is no indication that Hambleton Brothers was dissatisfied with the timber purchase price or contract, only that it had no opportunity to log the property. Hambleton Brothers's allegation that Ballinger intended to deceive it with Balkin's payment to Adams of a finder's fee is also unsupported.

Second, regarding Ballinger's concealment of his departure from Balkin in the 1996/1997 phone conversation, there is no evidence that Ballinger intended to conceal anything, or that Hambleton relied on any representation (or lack thereof) by Ballinger. In fact, James Hambleton testified that he did not rely on Ballinger, but instead spoke subsequently with Kinsey for clarification on Balkin's intent.

**[19]** Finally, Hambleton Brothers attempts to connect Ballinger to the fraudulent sale made by Abraczinskas, arguing that Ballinger should have disclosed the sale. Again, Hambleton Brothers did not offer any evidence that Ballinger knew of the unauthorized Fruitland property sale, or to dispute Ballinger and Kinsey's statements that they had no knowledge of and did not authorize Abraczinskas's actions. We affirm the district court's grant of summary judgment on the fraudulent concealment claim.

## E

**[20]** Lastly, we address Hambleton Brothers's WCPA claim. The WCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. In order

to allege a claim pursuant to the WCPA, a plaintiff must show: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). All five elements must be alleged to support a WCPA claim. *Id.* at 535. Assuming, without deciding, that the other WCPA elements are met, Hambleton Brothers offers no evidence that can support the public interest impact element of a WPCA claim. "Ordinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting the public interest." *Id.* at 538. However, if there is a "likelihood" that other plaintiffs will be injured similarly, a private, contract breach could still impact the public interest. *Id.* The factors indicating a public interest impact are:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?

*Id.* Hambleton Brothers offers no evidence of active solicitation or public advertising by Ballinger. There is also no evidence that the parties occupied unequal bargaining positions. To the contrary, Hambleton Brothers was actually the more experienced party, with fifty years in the timber industry, thirty by James Hambleton personally. As we see it the record before the district court, even when all Hambleton Brothers's evidence is credited and reasonable inferences are given thereon, shows nothing more than a private dispute, and no adequate public interest basis to invoke the WCPA.

## IV

We hold that the district court did not abuse its discretion by granting defendant Ballinger's motions to strike the James

Hambleton deposition errata or the Dale Kinsey declaration. On Hambleton Brothers's claims of breach of contract, piercing of the corporate veil, fraudulent concealment, and unfair or deceptive trade practices pursuant to the Washington Consumer Protection Act, the district court's grant of summary judgment is AFFIRMED. On Hambleton Brothers claim under Or. Rev. Stat. § 60.645, we hold that Hambleton Brothers has alleged facts sufficient to create a genuine issue of material fact and we therefore REVERSE the district court's grant of summary judgment on the Or. Rev. Stat. § 60.645 claim, and we REMAND for further proceedings not inconsistent with our decision.

**AFFIRMED in part, REVERSED in part, and REMANDED.**